VINCENT LA ROCCA, Respondent, v MORGAN LANE, as Judge of the Criminal Court of the City of New York, Appellant.

Second Department, April 7, 1975

*Louis J. Lefkowitz, Attorney-General (Robert S. Hammer* and *Samuel A. Hirshowitz* of counsel), for appellant.

*William Gallagher* and *Mario Matthew Cuomo (Eric A. Seiff, Pierce Gerety, Jr.,* and *John E. H. Stackhouse* of counsel), for respondent.

*Aaron Nussbaum* for Kings County Criminal Bar Association, Inc., *amicus curiae.*

*Ernest J. Bertolotti (Michael T. Sullivan, John E. Pearson, Michael S. O'Rourke, Scott E. Mollen* and *Martin J. Kilkeary* of counsel), for Ad Hoc Committee for the Defense of Clerical Rights, *amicus curiae.*

HOPKINS, Acting P. J. The petitioner has been an ordained Roman Catholic priest for 25 years. He was admitted to the Bar in 1973. He is employed as an attorney by the Legal Aid Society and was assigned to represent Cecilia Daniels, a defendant under criminal charges in the Criminal Court of the City of New York. He appeared before the court wearing his clerical collar, prepared to try the case before a jury on behalf of his client. The Assistant District Attorney objected to the appearance by the petitioner in the garb of a Roman Catholic priest. After considerable colloquy, during which the petitioner maintained both the right of the defendant to be represented by him in his clerical habit and his right to so

appear, the trial court directed him to remove his clerical collar before proceeding further in the trial.

The court then adjourned the case in order that its ruling might be reviewed. The petitioner thereafter brought this CPLR article 78 proceeding in the nature of prohibition to restrain the Criminal Court from preventing him from trying the case before the jury wearing a clerical collar. The Criminal Term of the Supreme Court[1] has granted the petitioner's application and has prohibited the Criminal Court from enforcing its order *(La Rocca v Lane,* 77 Misc 2d 123). We reverse and dismiss the proceeding. The Criminal Court did not act improvidently in directing the petitioner not to appear in a clerical collar and no constitutional rights of the petitioner or his client were violated by the direction.

The Criminal Court, in making its direction, was motivated by its concern that the members of the jury might be prejudiced by the appearance of the petitioner in his clerical garb and that, accordingly, a fair trial could not be conducted. The Criminal Term, on the other hand, found that no bias might be presumed, that by the *voir dire* the presence of bias might be detected and eradicated and that the defendant in the criminal case is entitled to the assistance of counsel of her own choice. These conflicting views, together with the constitutional right under the First Amendment raised by the petitioner, compel us to weigh issues of great importance within our system of justice.

The issues, as we see them, are threefold: (1) the right of the defendant in a criminal case to be represented by counsel attired in priestly garb, (2) the right of the petitioner under the First Amendment to appear in court as an attorney so attired before a jury, and (3) the power of the court to regulate the dress of an attorney.

## I. THE RIGHT OF THE DEFENDANT

We first note that the defendant in the criminal case is represented by the Legal Aid Society, not by the petitioner. The petitioner, as an attorney employed by the Legal Aid Society, was assigned by it to represent the defendant. The defendant, as an indigent, was entitled to the assistance of counsel *(Gideon v Wainwright,* 372 US 335), even though the crime charged was a misdemeanor (County Law, § 722-a). The

---

1. The proceeding was determined at Criminal Term, although proceedings pursuant to CPLR (art. 78) are returnable at Special Term.

right to counsel is not absolute *(People v Brabson,* 9 NY2d 173, 180); thus, the defendant could not force the court to assign particular counsel, even within the Legal Aid Society's office *(People v Howard,* 150 Cal App 2d 428; *People v Cox,* 22 Ill 2d 534, cert den 374 US 855; cf. *State v Rush,* 46 NJ 399; *People v Norman,* 252 Cal App 2d 381, cert den 391 US 923; *Commonwealth v Johnson,* 428 Pa 210; *Baker v People,* 299 F Supp 1265). The court's duty is simply to select competent counsel within the provisions of the statute (County Law, § 722; see 21 Am Jur 2d, Criminal Law, § 319).

The defendant's constitutional right to assistance of counsel is satisfied when he is represented by competent counsel. His right does not extend to representation by the petitioner, whether in clerical garb or not. In the event, then, that the petitioner was compelled for reasons grounded on religious belief or for other reasons to request to be relieved of his assignment, the defendant could not on account of her preference for the petitioner require the court to continue his representation. Indeed, in the context of this case, the Legal Aid Society would simply assign another attorney on its staff · to the defendant.

There is, in brief, no infringement of the defendant's right to counsel by the action of the Criminal Court.

## II. THE PETITIONER'S RIGHTS UNDER THE FIRST AMENDMENT

The free exercise of religious beliefs has been surrounded by special protection under the First Amendment. Though it is in many ways a kind of personal expression, the intrusion into which by State action is forbidden, the right of individual worship is not altogether beyond regulation by the State. The freedom to practice one's religion does not, for instance, deprive the State from compelling the individual's testimony before the grand jury *(People v Woodruff,* 26 AD2d 236, affd 21 NY2d 848). The State Constitution, indeed, states that "the liberty of conscience hereby secured shall not be so construed as to * * * justify practices inconsistent with the peace or safety of this state" (NY Const art I, § 3).

Of course, the First Amendment takes precedence over our State Constitution *(Cantwell v Connecticut,* 310 US 296). Hence, it is the Federal standard to which we must look in determining whether the petitioner's right of religious freedom has been violated by the order of the Criminal Court. The Federal standard requires us to find that any incidental

burden on the petitioner's exercise of his religion must be justified by a compelling State interest in the regulation of a subject within the State's power to regulate *(Sherbert v Verner,* 374 US 398, 403; *Wisconsin v Yoder,* 406 US 205, 220). A balancing of the particular values becomes, therefore, the mechanism whereby the constitutionality of the regulation is decided. In striking the balance, it has been suggested by a leading commentator that three elements are involved—first, the importance of the secular value underlying the regulation; second, the degree of necessity that the regulation bears to that value; and third, the impact that an exemption for religious reasons would have on the program carrying out the regulation (Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, Part 1., The Religious Liberty Guarantee, 80 Harv L Rev 1381, 1390). To this should be added the admonition spoken in the Supreme Court decision upholding laws abolishing polygamy that, although laws "cannot interfere with mere religious belief and opinions, they may with practices" *(Reynolds v United States,* 98 US 145, 166).

It should be noted that the petitioner claims that he is under instructions from his Bishop to wear his collar and that he fulfills his right of religious worship by doing so in the performance of his duties as an attorney. On the other hand, it is beyond question that the petitioner's dress is regulated by the court only when he is performing his duties as an attorney in a trial before a jury. The court did not undertake to prohibit him from wearing the clerical collar as a spectator, as a witness, or as a party. Undoubtedly, the relationship between the court and an attorney is more intimate and more subject to regulation than is the status of a spectator, witness, or party, although certainly there is residual power in the court even to regulate that status (American Bar Association Project on Minimum Standards for Criminal Justice, The Function of the Trial Judge, §§ 1.1, 5.3, 6.3, 6.8, 6.10 [Tentative Draft]).

We turn, then, to a consideration of the secular value involved. There is hardly a stronger interest within the governmental structure than the preservation of the right to a fair trial, both by the accused and by the prosecution. The Trial Judge's function largely rests in his duty to insure that this right is enforced and maintained. Even with respect to the constitutional right of the free press, the right of the Trial

Judge to control the proceedings within his courtroom may be pre-eminent (A.B.A. Project on Minimum Standards for Criminal Justice, Fair Trial and Free Press, § 3.5, subd. [a] [Tentative Draft]; cf. *Sheppard v Maxwell,* 384 US 333; *People v Jelke,* 308 NY 56).

Concerning the degree of necessity which the regulation bears toward the value, it is manifest that a fair trial is linked closely to the conduct of the attorneys appearing in the trial. An attorney is subject to the reasonable orders of the court to preserve a fair trial *(Sacher v United States,* 343 US 1; A.B.A. Project on Minimum Standards for Criminal Justice, The Function of the Trial Judge, § 6.5 [Tentative Draft], The Prosecution Function, § 5.2 [Approved Draft] The Defense Function, § 7.1 [Approved Draft]). Of course, the emphasis must be placed on the reasonableness of the orders; an attorney should not be fettered by directions which are arbitrary and bear no relation to the objective of a fair trial. We think that this requirement is answered by the rules which govern the power of the court generally to maintain decorum and fairness in a trial, to which we advert beyond.

Last, we consider what effect on a fair trial an exemption from the regulation would have in the program carrying out the regulation. There are few clergymen who practice law generally. An exemption for the petitioner would affect only the trials in which he appears. Nevertheless, he is a staff member of the Legal Aid Society, which is regularly engaged in the defense of persons charged with criminal offenses. Moreover, the regulation has a minimal effect on the petitioner's conduct, for it is directed against him only when he tries cases before a jury[2] and requires him only to doff his clerical collar. If, indeed, the court's order is reasonably aimed at attaining the value of a fair trial, an exemption, even for one attorney, would be unwarranted, since it would single out the petitioner for special favor.

On balance, then, we conclude that the petitioner's right to free exercise of religious belief is subject to reasonable regulation when he appears as an attorney in court to try a case before a jury. Other considerations support this view. The

---

2. The petitioner contends that this establishes the lack of reason for the regulation, since he may appear in nonjury cases or on other occasions in court in his clerical attire. But this claim ignores the difference between a jury trial and other court proceedings. It is arguable that even in a nonjury case the petitioner should not wear clerical garb (see discussion under "III" *infra),* so that he is favored by the regulation to this extent.

petitioner's right to practice as an attorney is quite different from his right to officiate as a clergyman. When he appears in court, he is not acting as a priest. This does not mean that he gives up his religious beliefs or his priestly duties when he acts as an attorney; it does mean, however, that when he enters on secular pursuits he is subject to reasonable regulations in the secular realm. Any exemption at all in behalf of the petitioner would tend to destroy a pattern of conduct common to all attorneys (cf. *Braunfeld v Brown,* 366 US 599; *United States v Hudson,* 431 F2d 468, cert den *sub nom. Hudson v United States,* 400 US 1011).

In addition, there exist stronger grounds for regulating action based on religious convictions than for regulating mere inaction, as the Supreme Court observed in the *Reynolds* case *(Reynolds v United States,* 98 US 145, 161, *supra).* In *Sherbert,* for example, the regulation which prevented the plaintiff from enjoying the benefit of unemployment compensation because of her refusal to work on Saturday (inaction) for religious principles was struck down *(Sherbert v Verner,* 374 US 398, *supra),* and in *Wisconsin v Yoder* (406 US 205, *supra)* it was the defendant's refusal to send his children to school beyond the eighth grade which was attacked. Here, however, the petitioner is seeking to engage in the active practice of the law, and his refusal to adhere to the direction of the court falls within that affirmative endeavor.

In summary, we are of the opinion that the petitioner's rights under the First Amendment must yield to the reasonable regulation of the court when he appears to try a case before a jury. The question still remains, however, whether the court's order was reasonable under the circumstances. To this question we now address ourselves.

### III. THE POWER OF THE COURT TO REGULATE THE ATTIRE OF AN ATTORNEY

The power of a court over proceedings in the courtroom cannot be better expressed than by the language of Judge (then Justice) GABRIELLI in *Matter of Peck v Stone* (32 AD2d 506, 508): "A Judge must have and does possess the power to enforce order and control behavior in the courtroom; and, as an officer of the court, an attorney is subject to the control and direction of the Judge *(People ex rel. Karlin v Culkin,* 248 NY 465). The Judge is properly given broad discretionary powers in the regulation of his courtroom; and so it should be.

Furthermore, membership in the Bar is a privilege burdened with conditions and while certain conditions of conduct may be imposed by a Judge, the imposition of any such rule must bear a reasonable relationship to contemporary conditions and ought to be imposed only after there is a reasonable foundation for the need of any rule.

"In becoming an officer of the court, an attorney becomes an instrument or agency to advance the ends of justice. Thus it is required that there be co-operation with the court whenever justice would be adversely affected if co-operation were withheld. While such is the responsibility of an attorney and while it is the duty of a Judge to preserve order and to insure that justice is not obstructed, it nonetheless follows that any order or regulation imposed upon attorneys practicing before him must be based upon factual conditions which leave no doubt that a continuance of the proscribed conduct will result in a disrespect for order and an impairment in the administration of justice. To this end, therefore, any such order or rule must have a reasonable or plausible basis, else this discretionary power is subject to being declared arbitrarily exercised."

It is difficult to mark a definite line which will conclusively fence off the discretionary power of a court to enforce procedures to insure the integrity of the judicial process. Each case turns on its own facts, but the main purpose of the procedure must always be kept in mind—the preservation of the judicial process. A judge must observe the duties impressed upon him by the Code of Judicial Conduct — one of whose canons dictates that he shall "maintain order and decorum in proceedings before him" (Code of Judicial Conduct, canon 3, subd A, par [2]) and another of which prescribes that he shall "diligently discharge his administrative responsibilities" (Code of Judicial Conduct, canon 3, subd B, par [1]). But there underlies all of these prescriptions the fundamental principle that the court shall conduct the business before it fairly toward all.

The Criminal Court clearly had in mind, in issuing its order, its desire to conduct a fair trial, stating that the petitioner's attire "would create a prejudice which would prevent [it] from conducting a fair and impartial trial before a jury." The petitioner argues with considerable force that the *voir dire* would effectively screen out of the jury those veniremen who might thus be prejudiced, and the Criminal Term,

likewise, noted that the "prejudices of the past have been tempered by the involvement of our clergymen in the now open citadels of public life" *(La Rocca v Lane,* 77 Misc 2d 123, 128, *supra).*

A judicious use of the *voir dire* might well lead to the selection of a jury which would not be biased by the petitioner's appearance in clerical garb as attorney for the defendant. There is, of course, no guarantee that such would be the result. One study has come to the conclusion that *"voir dire* is grossly ineffective as a screening mechanism" (Broeder, Voir Dire Examination: An Empirical Study, 38 So Cal L Rev 503, 528). Jurors do not always admit their preferences or their actions (cf. Broeder, Occupational Expertise and Bias as Affecting Juror Behavior: A Preliminary Look, 40 NYUL Rev 1079; Comment, 70 Yale LJ, 763, 777).

It is unnecessary, however, to come to the extreme position that the veniremen would conceal their prejudices and thus frustrate the objective of a fair trial. A fair trial encompasses more than a fair jury; it includes the atmosphere and the appearance of a fair trial. "It is not merely of some importance but is of fundamental importance that justice should not only be done, but should manifestly and undoubtedly be seen to be done" *(Rex v Sussex Justices* [1924], 1 KB 256, 259; cf. *Cox v Louisiana,* 379 US 559, 565). "Preserving and enhancing respect for law is of surpassing importance in the administration of justice and the standards emphasize the pervasive obligation of the judge to maintain and safeguard both the reality and appearance of justice and respect for the law by his judicial conduct and utterances" (A.B.A. Project on Minimum Standards for Criminal Justice, The Function of the Trial Judge, Introduction [Tentative Draft], p 4).

The petitioner's attire at the trial would undoubtedly affect the witnesses and the spectators. Witnesses for the prosecution, especially the complaining witnesses, might question whether the scales of justice had not been tipped by the petitioner's presence. The location of a clergyman at the side of a complaining witness during the selection of a jury has been said to be an error on the part of the court *(People v De More,* 45 Misc 2d 872, 874). Dress is "a continuing visual communication to the jury" *(People v Roman,* 35 NY2d 978, 979) and to others in the courtroom as well, and it represents, when attached closely to a concept or mode of life, a symbol-

ism which draws an appropriate response.[3] For this reason, state the American Bar Association Standards for Criminal Justice, The Prosecution Function [Approved Draft] (Commentary a. to § 5.2, pp 113–114): "Certain standards of dress, decorum, manners and orderly procedure have evolved over the centuries to enhance the authority of courts and the status and authority of the advocates commensurate with their special offices and powers. Such standards also serve to insure calm, dispassionate consideration which places the focus on the evidence rather than personalities."[4]

The court's power to regulate dress cannot be unreasonably exercised. Whether counsel preferred a bow-tie to a four-in-hand, or a gray suit to a blue, in common experience should have no influence on the conduct of a trial. There are idiosyncrasies which are beyond the power of a court or even the strictures of a book of etiquette to correct. When, nonetheless, a discernible nexus between dress of an attorney and the attainment of a fair trial becomes evident in common experience, the court should take such action as will be reasonably adapted to regulate the dress of the attorney.

The court's order in this case was reasonably adapted to achieve the purpose of a fair trial. We take note that the petitioner's protest against the order was respectful and obviously sincere. His opposition took the form of vigorous argument before the court, couched in dignified language, and in the institution of a proceeding to review the court's ruling by other authority. Our concern, nevertheless, is not with what we consider to be the petitioner's motives, sincere as they are, but rather with the integrity of the judicial process. That process must envelop not simply the petitioner, but all who appear in court or come to see the proceedings, and all must be aware of the court's interest in conducting a fair and impartial trial.

For these reasons, we reverse the judgment, on the law, without costs, and dismiss the petition on the merits.

---

3. In *United States ex rel. Robson v Malone* (412 F2d 848, 850) the symbolic rising on the entrance of the Judge into the courtroom was said to be sufficiently related to the functioning of the court as to constitute grounds for exclusion from the court of those spectators who objected to rising.

4. The Standards refer to the garb worn by counsel in England and Europe *(id.,* p 114). In England the gowns and wigs worn by barristers differ according to rank and gender (W. W. Boulton, Conduct and Etiquette at the Bar of England and Wales [4th ed., 1965], pp 80–81). Though the origin of the use of these articles doubtless stems from the common attire in the Middle Ages of student, clergy and public officials, they now serve the purpose of putting opposing counsel on a parity.

SHAPIRO, J. (dissenting). My sympathies are all with the majority in the position that it takes in this case and if I were free to disregard what I find to be the compelling requirements of the United States and New York State Constitutions, I would join in the opinion for reversal. However, while I agree with the majority that no constitutional right of the petitioner's client was violated by the direction of the Criminal Court that the petitioner remove his clerical collar as a condition of trying the charge against his client before the jury, I must reluctantly dissent from its conclusion that the direction violated no constitutional right of the petitioner.

Although the majority states that the petitioner claims that he is under instructions from his Bishop to wear his collar, and the record on appeal shows that he did make such a claim in his oral argument in the Criminal Court, his written papers in support of his article 78 application do not rely upon any claimed instructions from his Bishop but rest solely on the allegation that his wearing of the clerical collar at any public function is a continual act of worship and a symbol of his religious dedication and that his compliance with the Criminal Court's order to remove his clerical collar would offend his religious conscience and deny him his First Amendment right of free exercise of religion. Thus, the major issue raised by this record is whether the appellant's order that the petitioner remove his clerical collar as a condition of the court's permitting him to represent his client before a jury denies him his constitutionally guaranteed First Amendment right of free exercise of religion, which right is made applicable to the States by the Fourteenth Amendment (*Cantwell v Connecticut,* 310 US 296, 309).

If the answer be in the affirmative, we are faced with the consequent question of whether the limitations sought to be imposed on this constitutional right can be justified by a compelling State interest. Since the majority does not dispute the fact that the applicable Federal standard in such a case is that any incidental burden on the petitioner's right to free exercise of religion "must be justified by a compelling State interest in the regulation of a subject within the State's power to regulate", I shall not belabor that point.

The core of the question here presented, it seems to me, is answered in *Sherbert v Verner* (374 US 398, 403, 404), cited by the majority, where Mr. Justice BRENNAN, speaking for the court, said, "Plainly enough, appellant's conscientious objec-

tion to Saturday work constitutes no conduct prompted by religious principles of a kind within the reach of state legislation. If, therefore, the decision of the South Carolina Supreme Court is to withstand appellant's constitutional challenge, it must be either because her disqualification as a beneficiary represents no infringement by the State of her constitutional rights of free exercise, or because any incidental burden on the free exercise of appellant's religion may be justified by a 'compelling state interest in the regulation of a subject within the State's constitutional power to regulate * * *' *NAACP v Button,* 371 US 415, 438.* * *

"Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship."

In *Wisconsin v Yoder* (406 US 205, 214) the court said: "It follows that in order for Wisconsin to compel school attendance beyond the eighth grade against a claim that such attendance interferes with the practice of a legitimate religious belief, it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause."

So, too, in our case the State may not bar the petitioner from, or limit his right to, the practice of the law by compelling him, if he wishes to try a jury case, to abandon his pattern of conduct, in the exercise of his religious beliefs, of wearing his clerical collar whenever he appears in public. "Governmental imposition of such a choice" clearly would put on his free exercise of religion "the same kind of burden * * * as would a fine imposed against" him for his mode of worship (see *Sherbert v Verner, supra,* p 404).

But the majority, after conceding that the Federal standard requires it "to find that any incidental burden on the petitioner's exercise of religion must be justified *by a compelling State interest in the regulation of a subject within the State's power*

*to regulate",* goes on to conclude that "a balancing of the particular values becomes, therefore, the mechanism whereby the constitutionality of the regulation is decided" (emphasis supplied). But the effect of the majority's substitution of a balancing test for the compelling-State-interest test is tantamount to excising the latter standard. Under the compelling-State-interest test, even if there is a possibility that the practice enjoined might endanger the State's right to a fair trial, "it would plainly be incumbent upon the * * * [the appellant] to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights" *(Sherbert v Verner,* 374 US 398, 407, *supra).* Hence, when the majority seeks to apply the compelling-State-interest test by a process of balancing the competing values of the State's right to a fair trial against the petitioner's right to a free exercise of religion, without a prior determination of whether the preservation of the former in the circumstances of this case requires that the First Amendment right of the petitioner be infringed, it is, in fact, giving mere lip service to the applicable compelling-State-interest test established to make clear the preferred position of that First Amendment right and is applying a completely different test, in negation of the concededly applicable Federal standard.

Only if the majority could find as a fact, as it does not, that the record demonstrates the ineffectiveness of existing alternative methods for avoiding any potential bias on the part of members of the jury panel can the process of balancing the competing values of the conflicting rights be involved.

In this respect it must be noted that even though there is a compelling State interest on the part of the State to insure a fair trial in criminal cases both for the defense and the prosecution, this, standing by itself, cannot suffice to justify an infringement of the petitioner's First Amendment right to free exercise of religion. Thus, the court in *Sherbert* said *(supra,* p 406):* "It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation,' *Thomas v Collins,* 323 US 516, 530." Here, as in *Sherbert,* "no such abuse or danger has been advanced" *(supra,* p 407). The appellant concedes that all that his order sought to avoid was the *possibility* of bias. Neither the court which issued the order to the petitioner to divest himself of

his clerical collar nor the prosecutor who objected to the petitioner's being allowed to wear his collar offered any proof of any prejudicial impact on the jury. Rather, the appellant argues only that his order was justified by the possibility that "the wearing of a clerical collar by a defense counsel before a jury *could be* improperly construed by it as an assertion of his client's innocence"; that what the court was attempting to do "was to take a *prophylactic measure* in order to insure that an extraneous element which might cause bias, either for the prosecution or the defense, would not reach the jurors" (emphasis supplied). The appellant nowhere endeavors to show that the possibility which moved him to limit the petitioner's free exercise of religion could not be adequately handled by the use of appropriate questioning of members of the jury panel in *voir dire* and by appropriate instructions to the jury.

The law is clear that the mere opportunity for prejudice raises no presumption that such prejudice exists *(Holt v United States,* 218 US 245, 251). Here, no evidence was offered to establish the existence of such bias, because the prospective jurors had not even been questioned as to whether they would be improperly influenced in determining the issues by reason of the petitioner's garb. Hence, *Sheppard v Maxwell* (384 US 333), cited by the majority, which involved a trial where the hippodrome atmosphere the trial court had permitted to develop had clearly resulted in jury bias, is inapposite. Nor can any claim be made that the petitioner's clerical collar was in any way inappropriate, unconventional, unsuitable, disturbing or distracting in the courtroom. Hence, *Matter of Peck v Stone* (32 AD2d 506) and *People ex rel. Karlin v Culkin* (248 NY 465), both of which sustained a court's power to require attorneys to maintain an atmosphere comporting with dignity, are also inapposite. I do not dispute the power of a trial court to control the behavior of attorneys before it to assure the observance of proper decorum. The question here, however, is whether, in pursuit of this goal, the court may use that power to deny an attorney his First Amendment right to free exercise of religion because it fears (without proof) that his exercise of that right might possibly have the effect of appealing to the bias of some of the jurors, even though there are other available means of avoiding that possibility, means which would reach the goal without infringing on the petitioner's First Amendment rights.

The majority quotes from *Matter of Peck v Stone* (32 AD2d 506, 508, *supra)* to the effect that "membership in the Bar is a privilege burdened with conditions and while certain conditions of conduct may be imposed by a Judge, the imposition of any such rule must bear a reasonable relationship to the contemporary conditions and ought to be imposed only after there is a reasonable foundation for the need of any rule." The inference is that since membership in the Bar is a privilege rather than a right, limitations imposed on its exercise will be sustained if they have a reasonable foundation, a test far less drastic than the compelling-State-interest test. But in *Sherbert v Verner (supra,* p 404) the Supreme Court of the United States, dealing with the same contention, there made with respect to the collection of unemployment insurance, said: "Nor may the South Carolina court's construction of the statute be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant's 'right' but merely a 'privilege.' It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."

While it is clear that an attorney may be required to make certain concessions as a condition of receiving the privilege of practicing law (see *Matter of Peters,* 250 NY 595; *People ex rel. Karlin v Culkin,* 248 NY 465, *supra; Matter of Goldstein,* 220 App Div 107; *Matter of New York County Lawyers Assn. [Roel],* 3 NY2d 224, app dsmd *sub nom. Roel v New York County Lawyers Assn.,* 355 US 604), this cannot suffice to sustain a claim that a court may use its supervising power over attorneys to infringe on their constitutionally protected right to free exercise of religion *without establishing the existence of a compelling State necessity for such action.*

In a further effort to support their conclusion, the majority makes a *de minimis* argument. First it stresses that this denial of the free exercise of religion will have little effect generally, since "there are few clergymen who practice law generally." But the issue is not whether few or many will suffer from a rule barring attorneys who are clerics from wearing their clerical garb when appearing for their clients before juries, but whether the rule has denied this respondent his constitutionally guaranteed right to free exercise of religion in the absence of the existence of a compelling State interest warranting a denial of that right. Second, the major-

ity contends that the order attacked by the petitioner "has a minimal effect on the petitioner's conduct, for it is directed against him only when he tries cases before a jury and requires him only to doff his clerical collar." But the First Amendment forbids the State not only "to condition the availability of benefits [in this case the petitioner's right to wear his clerical garb whenever he appears in court as counsel for any party] upon this * * * [the petitioner's] willingness to violate a cardinal principle of * * * [his] religious faith" because it thereby "effectively penalizes the free exercise of * * * [his] constitutional liberties" (Sherbert v Verner, 374 US 398, 406, supra), but it also denies to the State the right to say what is a cardinal principle and what is a subordinate principle of the petitioner's religious faith (see Board of Educ. v Barnette, 319 US 624, 642).*

In sum, the majority's conclusion, that the petitioner's rights under the First Amendment must yield to the directions of the court that he not wear his clerical collar when he appears before it to try a case before a jury, results from the adoption of a balancing standard which departs wholly from that which the majority concedes is the Federal standard required to be applied. I therefore respectfully dissent from the conclusion reached by the majority.

There is really no need, therefore, to discuss the final portion of the majority's opinion, which deals with the subordinate, and in my view irrelevant, question of whether the court's order was reasonable. A few words of comment on the views the majority expressed may, however, not be inappropriate. The majority concedes that "a judicious use of the voir dire might well lead to the selection of a jury which would not be biased by the petitioner's appearance in clerical garb as attorney for the defendant." In seeking to explain away this concession it belittles the effectiveness of the voir dire as a screening mechanism. The majority notes, without distinguishing the question of the effect of clerical garb worn by an

---

* In his opinion for the court in that case (p 642), Mr. Justice JACKSON said, "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." If no official, including a Judge, may do so, he certainly is barred from ruling as to what is a cardinal principle of a person's religious faith and what is a subordinate principle which may be infringed by court order, without a previous valid finding that such infringement is justified by a compelling State interest in the regulation of a subject within the State's power to regulate.

attorney from any other questions probing for potential jurors' prejudices on other matters, that there is "no guarantee" that a *voir dire* would result in a bias-free jury. Thus, implicit in the majority's argument is a rejection of the entire process of *voir dire,* a step which, I am sure, the majority does not call for or support.

MARTUSCELLO and LATHAM, JJ., concur with HOPKINS, ACTING P. J.; SHAPIRO, J., dissents and votes to affirm the judgment, with an opinion.

Judgment of the Supreme Court, Kings County, entered April 24, 1974, reversed, on the law, without costs, and petition dismissed on the merits.

