OPINION OF THE COURT
Hugh F. McShane, J.
Petitioner herein, Reverend Vincent La Rocca, an attorney admitted to the Bar in the State of New York and employed by the Legal Aid Society, criminal defense division, since 1973, and a Roman Catholic priest, seeks permission of this court to continue to wear his clerical collar while representing defendant, Anna Rodriguez, as her attorney, upon the trial of an indictment charging defendant with criminal sale of marihuana in the third degree and criminal possession of marihuana in the third degree.
The District Attorney of the County of Kings has entered an objection to the wearing of clerical garb by Reverend La Rocca at trial the thrust of which is that a fair trial cannot be secured herein if Reverend La Rocca were to proceed to trial wearing clerical garb because of the likelihood that prejudice, either favorable or unfavorable, in the minds of the potential jurors would override their ability to be objective and impartial, and cites as authority for his posture the case of La Rocca v Lane (37 NY2d 575, cert den 424 US 968), which upheld the prohibition by the Trial Judge in that case against petitioner’s appearance at trial wearing clerical garb while representing the defendant.
The previous adjudication by the Court of Appeals of this State of the identical issue presented to this court arose through the vehicle of a CPLR article 78 proceeding brought by petitioner to prohibit a Criminal Court Judge from ordering him to remove his clerical collar prior to continuing as defense counsel in the trial of an action in Kings County Criminal Court. The issue reached the Court of Appeals pursuant to CPLR 5601 (subd [a], pars [i], [ii]; subd [b]), *538 appealing an order and judgment of the Appellate Division, Second Department (47 AD2d 243), dismissing the petition of petitioner-appellant.
There, the Court of Appeals ruled that the remedy of prohibition under CPLR article 78 was available to petitioner in seeking to restrain a Criminal Court Judge from enforcing his direction to petitioner to remove his clerical collar before appearing as defense counsel in a criminal jury trial. The court further ruled that the trial court properly exercised its right to control behavior in the courtroom by the trial court’s direction that petitioner change his clerical garb since there was a risk that a fair trial could not be had. The basic reason for the ruling by the court was its finding that jurors might view a clergyman’s statements differently from those of others, or might subject the defendant to religious prejudice.
Petitioner argues that his right to freely exercise his religion under the First Amendment to the Constitution of the United States would be violated if he were forced to remove his clerical garb as a condition for the granting of permission to try the case before a jury or if he were forced to abandon his client by substitution of another Legal Aid Society attorney to represent the defendant for whom he presently appears as counsel.
Petitioner further argues that requiring him to remove his clerical collar in the courtroom denies him the equal protection of the law because, since his personal commitment to his religious calling is irrevocable (the wearing of clerical garb forming part and parcel of such commitment) and, indeed, constitutionally protected, the proscription of clerical garb in the courtroom in effect denies him the right to seek his livelihood and source of income by denying him access to the very arena in which he sought to center his professional activity and which was granted to him by the licensing requirements of New York State.
Petitioner has outlined and submitted the explicit direction of his superiors requiring him to wear his collar under the Canon Law of the Roman Catholic Church, citing canon 136 of the Universal Code, as to which the Baltimore Council, interpreting such canon, stated that the mandate ordains that in a public forum the ordained cleric must wear his Roman collar. Furthermore, he cites a recent pronouncement of Pope John Paul II that a priest is a unique person and that such *539 uniqueness must be manifested in his dress, i.e., by wearing his priestly collar. Petitioner, therefore, seeks from this court a ruling de novo on the issue as to whether his wearing clerical garb would prevent a fair trial of the indictment herein.
While it would be facile for the court to rely on stare decisis and peremptorily deny the relief sought herein, it would be a blatant denial of the function of the judicial process to view each case with a clear eye and an open mind. Over four years have passed since the ruling of the New York Court of Appeals in La Rocca v Lane (37 NY2d 575, supra), and the world has turned over many, many times. Clearly, the public mind has been exposed even further to the foibles and follies of prejudice during this lapse of time, and even the most fixed prejudices of most citizens have been subject to the dissection of the innate irrationalities of such prejudices. While we are light-years away from the eradication of prejudice, it is to be hoped that some progress has been made in this direction. Moreover, the Court of Appeals itself, in the recent case of Matter of Higby v Mahoney (48 NY2d 15, 18) urges just such a view, stating, in a Per Curiam opinion: "The doctrine of stare decisis does not, of course, demand unyielding resignation to even recent precedent.[1] Policy considerations are inherent in the prudent, considered application of the doctrine. (People v Hobson, 39 NY2d 479.) Whether it is appropriate for the courts to overturn judicial precedent must depend on several factors. Among them will be the nature of the rights and interests at stake and the extent and degree to which action may justifiably have been taken in reliance on the precedent (Matter of Eckart, 39 NY2d 493, 500; People v Hobson, 39 NY2d 479, 488-489, supra). In addition to such familiar considerations but apart therefrom, weight may properly be attached to the relative ease or difficulty of modification or change in the precedent. Invitations to judicial reconsideration carry more weight when addressed to constitutional issues because of the very great difficulty of effecting change by constitutional amendment.”
In addition, the Supreme Court of the United States has considered the question of "freedom of expression” since the *540 ruling in La Rocca v Lane (supra) which this court views as affecting the decision of the Court of Appeals.
In McDaniel v Paty (435 US 618, 620) the Supreme Court held that a provision of the Constitution of the State of Tennessee barring "Minister[s] of the Gospel, or priest[s] of any denomination whatever” from serving as delegates to State constitutional conventions violated the First and Fourteenth Amendments of the Constitution of the United States. The Supreme Court found that the challenged provision violated the candidate’s (a Baptist minister) First Amendment right to the free exercise of his religion, made applicable to the States by the Fourteenth Amendment, in that it conditioned his right to the free exercise of his religion on the surrender of his right to seek office.
Mr. Chief Justice Burger, announcing the judgment of the court, reviewed the history of clergy disqualification provisions of State Constitutions, noting it was a practice carried over from England and the continent and its rise and fall by the States to the contemporary point where only one State still excludes ministers from certain public offices. He refers to a disagreement which Thomas Jefferson had with James Madison on the issue of preventing the clergy from holding office, stating (435 US, at pp 623-624): "James Madison, however, disagreed and vigorously urged the position which in our view accurately reflects the spirit and purpose of the Religion Clauses of the First Amendment. Madison’s response to Jefferson’s position was: 'Does not The exclusion of Ministers of the Gospel as such violate a fundamental principle of liberty by punishing a religious profession with the privation of a civil right?’ ” He then goes on to say (supra, p 626): "However, the right to the free exercise of religion unquestionably encompasses the right to preach, proselyte, and perform other similar religious functions * * * Murdock v. Pennsylvania, 319 U. S. (1943); Cantwell v. Connecticut, 310 U. S. 296 (1940).” Furthermore, the court (supra, p 628), quoting from Wisconsin v Yoder (406 US 205, 215) reaffirmed that " 'The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.’ ” This court, therefore, deems it proper to consider the issue herein de novo and declines to rest on the prosecutor’s argument of stare decisis.
*541 FREEDOM OF RELIGION
The history of this country and its constitutional development is replete with questions addressed to the issue of the extent to which a religion may be practiced when weighed against the secular character of our republic. The First Amendment to the Constitution of the United States contains two clauses which specifically deal with religion. The First Amendment directs that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof’. Obviously, then, there is an innate tension between a clause forbidding legislation which tends to establish a religion and a clause directing that no restriction or inhibition prevent its free practice.
This court is not concerned in the instant matter with the establishment of a religion and will restrict itself to the question of what limits may be placed upon the freedom of exercise of religion as it may affect the present application.
The prohibition against laws inhibiting the free exercise of religion was first made applicable to the States through the due process clause of the Fourteenth Amendment to the Constitution of the United States in Cantwell v Connecticut (310 US 296).
The Court of Appeals in La Rocca v Lane (37 NY2d 575, 583, supra) stated, almost five years ago: "A clergyman is accorded high status by most members of our society. Whatever the character of the man or woman who wears the cloth, the cleric is accorded a measure of respect and trust unlike that which is given to those of other vocations. Consequently, it is understandable, but not condonable, that a juror might view differently statements made by a member of the clergy than those made by others, and might ascribe a greater measure of veracity and personal commitment to the rightness of his client’s cause.”
It is this court’s perception that the likelihood of such appraisal of clergymen and clergywomen by propsective jurors is not so fixed and immutable a reaction, given the plethora of social, political, and even criminal situations occurring since 1975 (the date of the Court of Appeals decision) in which men and women of the cloth have been primary figures. We have seen an ever-increasing representation in the legislative departments of the Federal Government and that States by members of the clergy actively proselytizing their political as *542 well as their religious faiths; we have seen the clergy take up the cudgels of interest and dedication against the social ills that plague our citizens in much greater measure in recent years; indeed, we are almost daily reminded by the communications media that the clergy are witness to an ever-increasing number of its members falling into venality, unseemly behavior, and outright criminality. News of the respresentatives of the religious community falling from grace and displaying the proverbial feet of clay, which in times past was spoken of in hushed and secretive tones, is a topic of open conversation today.
The sum of the geometrically progressing involvement of the clergy into areas of secular activity, it seems to this court, thrusts upon our citizens a realization that men and women of the cloth are men and women first, equipped with all the characteristics of human beings and the added factor of their singular vocations. To assume that prospective jurors still steadfastly maintain their awe of and respect for the clergy as a fixed psychological position is to assume that the history of contemporary events has completely eluded such citizens. Certainly, the high esteem in which our noble profession, the law, had been held over many centuries by lay persons has been eroded by the activities of our own miscreant practitioners. To deny that a like respect for the clergy has not been attenuated over the past few years is to deny a reality. While most unfortunate and depressing, the public’s esteem of religious leaders of all faiths has been encroached by a growing cynicism which denigrates the absolutes of trust and respect formerly accorded the clergy. The court, therefore, believes that the basis of the posture of the Court of Appeals has been altered by such incursions by the clergy into the secular world and that the measure of respect and trust formerly accorded clergymen is less certain.
This court concurs that a Trial Judge has the inherent power to control the attire of attorneys appearing before the court and is a proper subject of the court’s concern. However, to make a judicial determination in this day and age that the appearance of an attorney wearing a clerical collar immediately eradicates any possibility of a fair trial by reason of that fact alone is to classify the wearer of such apparel as a catalyst producing instant prejudice and usurps the function of the voir dire of a jury. Clearly, the myriad recognized prejudices which may exist in the minds of jurors, such as *543 those based on race, social status, occupation, appearance, and other categorizations, have traditionally been probed for by way of a searching voir dire. In fact, in a recent appeal before the Appellate Division of the Second Judicial Department (Close-It Enterprises v Weinberger, 64 AD2d 686), that court suggested the same remedy. There, the Trial Judge had ordered that the defendant, a devout adherent of the Jewish faith, remove his yarmulke during the trial although no objection had been made during the voir dire of the jury, when defendant had been seated before the jurors wearing his skullcap. Defendant chose to be excluded from the courtroom during the trial sincerely believing that wearing his skullcap was a mandatory part of the observance of his religion.
The Appellate Division reversed the judgment against the defendant, stating (supra, p 686), "The defendant should not have been placed in the situation of having to choose between protecting his legal interests or violating an essential element of his faith.” Further, it stated (supra, pp 686-687): "The situation here is very different from that presented in La Rocca v Lane (47 AD2d 243, affd 37 NY2d 575), which involved an attorney who was also a priest and who desired to represent a defendant in a criminal case while attired in his clerical garb. We believe that the defendant’s right to the free exercise of his religion, under the circumstances presented, was not outweighed by the right of all parties to a fair trial. There was no reason to believe that a fair trial could not have been achieved if the defendant, a party to the litigation, wore a skullcap. * * * In any event, any potential prejudice could have been taken care of through the voir dire and the court’s instructions to the jury. ” (Emphasis supplied.)
In effect, the Appellate Division has stated that possible prejudice or bias, either favorable or unfavorable, as it may affect a jury’s reaction to a religiously garbed party’s activities at trial, is less likely to prevent a fair trial than a jury’s reaction to a party’s activities when represented by a religiously garbed attorney. To the contrary, it is this court’s opinion that the converse of the Appellate Division’s findings, as perceived, is closer to the realities. A clerically garbed attorney is a step removed from his client in a trial wherein a jury determines the alleged activities of the parties and, consequently, the attorney is less likely to be affected by the presence of religious attire in such a situation than would his client, were he to wear religious attire. In any event, as noted *544 above, the Appellate Division would cure the harm of possible prejudice by the voir dire and the court’s instructions to the jury, which raises the following question: If any potential prejudice can be eliminated through a voir dire and the court’s instructions in a trial where a party wears the attire in question, why cannot such vehicles eliminate potential prejudice where the attorney, an individual whose activities are not in issue, appears in clerical garb? Why is it that prejudice either for or against the clergy cannot be properly sought by an equally searching voir dire? Admittedly, jurors may not readily verbalize their prejudices concerning men or women of the cloth, but it is not this court’s experience that they are less loath to express other prejudices.
In addition, this court questions the ability of a Judge to make an objective determination that favorable or unfavorable bias or prejudice affecting an attorney dressed in clerical garb would prevent a juror from fairly appraising the issues on trial. Certainly, jurors have been selected in myriad cases wherein they have expressed a leaning or innate bias in a case but have still insisted they can compartmentalize such leanings and separate them from their function as triers of the facts. A traditional voir dire is flexible enough to determine whether such dichotomy between a juror’s bias and his ability to function as a fair and impartial juror, in spite of such bias, exists.
THE BALANCING TEST
In recent years, the Supreme Court has developed a two-part balancing test when confronted with a number of cases involving an alleged burden on the free exercise of religion by a regulation or statute. (See, e.g., Braunfeld v Brown, 366 US 599; Sherbert v Verner, 374 US 398; Wisconsin v Yoder, 406 US 205, supra.) Basically, the first prong of this test is the requirement that the plaintiff or petitioner must demonstrate that the regulation or law under scrutiny resulted in a substantial burden on his free exercise of religion. The second prong of the test is a necessary demonstration by the State that the regulation or law in question was based upon a compelling or overriding interest of the State. The balance to be determined will be a weighing of the burden on the free exercise of religion in the scale with the importance of the State interest in the law or regulation.
Petitioner has demonstrated to this court’s satisfaction that *545 the ruling that he may not wear his clerical collar at trial has resulted in a substantial burden on his free exercise of religion. Reverend La Rocca has produced the directives of his superiors in his church hierarchy requiring him to wear the priestly raiment. His own intense desire to display his religious calling is almost palpable and not of such a nature as to be merely a personal vanity. The belief that the wearing of the clerical collar in the public forum, this court is satisfied, pervades his daily life. The systematic wearing of his priestly clothing has been a part of his existence for a substantial period of years. Petitioner’s belief in the necessity of wearing his distinctive apparel is tied to the principles and literature of his church. To find that requiring petitioner to remove his clerical garb while appearing as an attorney at trial is merely an incidental burden upon his religious belief would be to minimize a shared belief with literally thousands and thousands of his coreligionists. What, then, to paraphrase Mr. Justice Brennan in his dissent in Braunfeld v Brown (supra), is the compelling State interest which impels the State of New York to impede petitioner’s freedom of worship? What overbalancing need is so weighty in the constitutional scale that it justifies this substantial limitation of petitioner’s freedom?
In balance against this court’s finding of the substantial burden on petitioner is the prosecutor’s claim that the State’s compelling or overriding interest is to provide the People, as well as the defendant, with a fair trial. Undoubtedly, it is in the State’s abiding interest to see that every trial is a fair one. Yet, the conclusion urged by the prosecutor herein, i.e., that a fair trial is impossible wherein a defendant’s attorney appears in clerical garb, is unsubstantiated by any empirical evidence to support such a conclusion. Mr. Justice Shapiro, in his dissent in La Rocca v Lane (47 AD2d 243, 256 supra), when the issue was considered by the Appellate Division, made this same observation: "Here, no evidence was offered to establish the existence of such bias, because the prospective jurors had not even been questioned as to whether they would be improperly influenced in determining the issues by reason of the petitioner’s garb.”
Clearly, if there were no question that a fair trial could not be had wherein an attorney wore clerical garb, the issue before this court would be academic. However, the prosecutor herein has failed to convince this court that his postulate is valid and obtains in the contemporary scene.
*546 Curiously, the very prosecutor’s office that is strenously opposing petitioner’s application herein has, apparently just as strenuously, opposed a defendant’s motion seeking to prevent a Catholic priest from wearing his clerical collar while testifying as a prosecution witness in a trial recently held in this same county (People v Ramirez, NYLJ, Sept. 11, 1979, p 12, col 2). Is not the spectre of an unfair trial raised in both situations if the clerical garb is put in view of the jurors? If the monstrous head of prejudice rises when the attorney is a priest, does it not bring forth its ugly visage when a witness is a priest? The prosecutor has failed to convince this court that jurors viewing a clerically garbed attorney would be more likely to react, either favorably or unfavorably, in the area of prejudice than in a trial where a witness is also in clerical garb.
EQUAL PROTECTION
Reverend La Rocca urges upon the court that he has been denied equal protection of the law. He avers that the Appellate Division of the Second Department and the Court of Appeals of New York have classified him as an attorney who cannot engage in representing his clients in the conduct of a trial due to his wearing of clerical garb. As stated above, he argues that prior rulings affecting his freedom to practice his profession as an attorney deny him the right to seek his livelihood and source of income by preventing him from representing a client at trial in behalf of his employer, the Legal Aid Society. He further argues that he is totally prohibited by the prior rulings from representing clients at trial even were he to enter private practice. He points out that he attended law school, sat for the Bar examination, was interviewed by and passed the requirements of the Committee on Character and Fitness, and was admitted to the Bar in New York, all while wearing his clerical garb. At no point was he ever advised that his clerical attire would prevent him from exercising the privileges and rights of an attorney duly admitted to the practice of law in all spheres and areas of activity.
The prosecutor, on the other hand, argues the doctrine of separation of church and State and that petitioner, when he chose to become an attorney, knew there would be a "conflict” concerning his attire. The court finds this argument untenable and without merit.
In New York State, the prerequisites and procedures for *547 admission to the Bar are contained in section 90 of the Judiciary Law and CPLR article 94. Nowhere in these statutes is there any regulation as to the attire of attorneys required while representing a party on trial. Nevertheless, as noted above, a Trial Judge has the authority to see that the manner of dress of any attorney appearing before such Judge is not bizarre, offensive, or in any manner detrimental to the proper decorum of a courtroom.
The Fourteenth Amendment of the Constitution of the United States commands that no State shall deny to any person within its jurisdiction the equal protection of the laws. The effect of the equal protection clause is to assure that similar persons will be treated in similar fashion by the State. It does not block the State’s power to classify people, in the application of its laws, but it does forbid such classifications if they are based upon impermissible criteria or arbitrarily employed to burden a particular group of persons. Moreover, the amendment’s guarantee does not concern itself with whether or not an individual was properly placed in a particular classification; it does concern itself, however, with whether the classification is properly constructed.
Ordinarily, statutes or regulations which classify individuals with regard to their ability to exercise rights outlined in the Bill of Rights do not require resolution under equal protection scrutiny. The resolution of such a classification is usually had under a scrutiny of the law’s efficacy vis-á-vis the particular amendment allegedly violated. However, issues arising out of a claim that a law or regulation which burdens an individual’s freedom of speech,[2] freedom of religion,[3] assembly,[4] petition,[5] or the freedom of the press[6] are not only reviewed under First Amendment principles, but also under the guarantee of equal protection.
Petitioner herein argues that the rulings of the Appellate Division and the Court of Appeals treat him dissimilarly from every other attorney admitted to practice in New York State and thereby deny him equal protection. His posture is that those rulings stigmatize him as an attorney with severely limited privileges and rights even though he has met and *548 satisfied, to the State’s satisfaction, all the prerequisites and qualifications to be licensed as an attorney in the State of New York. He cites as the sole reason for such classification his exercise of his First Amendment right to the free exercise of his religion.
The Supreme Court of the United States, in its testing of the amendment against State legislation or regulations, has, again, made the purpose of the law or regulation in question a vital consideration. Unless the law or regulation alleged to be stifling a fundamental right promotes an overriding or compelling interest of the State, its validity will be called into question.
The prosecutor has failed to demonstrate wherein the ruling in La Rocca v Lane (37 NY2d 575, supra), promotes an overriding or compelling interest of the State which justifies such burdening of petitioner, when there is available a traditional and viable alternative, i.e., a properly conducted voir dire of a jury panel, which would eliminate the burden presently constructed by such rulings.
It is this court’s opinion that the prior ruling in La Rocca v Lane (supra) classifies petitioner and any other attorneys in this State who are also members of the clergy upon an impermissible criterion, i.e., the wearing of clerical garb, and burdens them as members of such a classification. The court finds such a burden to be violative of the Fourteenth Amendment’s guarantee of equal protection of the laws in that it is improperly constructed upon a foundation that is violative of the burdened group’s First Amendment right to freedom of exercise of religion.
This court, therefore, concludes as follows:
(1) That an in-depth and searching voir dire of the members of a jury panel is the traditional and proper vehicle to seek out and eliminate potential bias or prejudice, as it may affect the passage of a fair trial wherein one of the attorneys appears wearing clerical garb; and,
(2) That to continue to burden petitioner’s freedom of the exercise of his religion by limiting his rights and privileges as a duly admitted and licensed attorney is violative of his Fourteenth Amendment guarantee of the equal protection of the laws.
The application of petitioner to wear his clerical garb is granted.

. "Without conceding that the earlier case was incorrectly decided, it is noted that in any discussion of stare decisis it must be taken, arguendo, that strong arguments can be mounted to support a different result. Were the situation otherwise there would be no occasion to rely on the doctrine.”

. Gitlow v New York (268 US 652).

. Cantwell v Connecticut (310 US 296, supra).

. De Jonge v Oregon (299 US 353).

. De Jonge v Oregon (supra, p 364).

. Near v Minnesota (283 US 697, 701).