Cara Leslie **ALEXANDER,**
et al., Plaintiffs,

v.

**FEDERAL BUREAU OF INVESTIGATION, et al., Defendants.**

Nos. Civ. 96–2123 RCL, Civ. 97–1288 RCL.

Unites States District Court,
District of Columbia.

May 28, 1998.

26

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the court on plaintiffs' Motion to Compel, Order to Show Cause and for Sanctions Including Attorneys' Fees and Costs,[1] the Motion of Williams & Connolly and Skadden, Arps, Slate, Meagher & Flom, LLP, On Behalf of President Clinton, To Intervene and For Protective Order, James Carville's Motion for Leave to File Supplement to Opposition to Plaintiffs' Motion to Compel, and Motion for Leave to File a Surreply to Plaintiffs' Request for Sanctions Against Defendant Hillary Rodham Clinton. Upon consideration of the submissions of the parties and the relevant law, plaintiffs' motion to compel and for sanctions is granted in part and denied in part. The motion of Williams & Connolly and Skadden, Arps, Slate, Meagher & Flom, LLP, is denied, the motion of James Carville is granted,

and the motion of Hillary Rodham Clinton is granted.

## I. *Background*

The underlying allegations in this case arise from what has become popularly known as "Filegate." According to their complaint, plaintiffs allege that their privacy interests were violated when the FBI improperly handed over to the White House hundreds of FBI files of former political appointees and government employees under the Reagan and Bush Administrations. During the discovery phase of this litigation, plaintiffs have deposed, among others, Paul Begala, James Carville, Terry Lenzner, George Stephanopoulos, and Stacey Parker. The motion to compel filed by plaintiffs alleges that defendants, deposition witnesses, and defendants' counsel "have engaged in a course of sanctionable litigation conduct in this case." Pls.' Mot. to Compel at 1. Specifically, plaintiffs allege shortcomings in document production associated with the depositions of Stephanopoulos, Carville, Begala, and Lenzner, improper assertions of claims of privilege by counsel for defendants and these deposition witnesses and deposition witness Stacey Parker, and repeated instances of misconduct during the depositions. Plaintiffs seek to have this court order Stephanopoulos, Carville, Begala, and Lenzner to produce to plaintiffs all documents requested in plaintiffs' subpoenas duces tecum and to have these individuals along with Parker made available for continued depositions regarding the documents and testimony previously withheld under improper claims of privilege.

Plaintiffs also request an order to show cause why these deponents and their counsel should not be sanctioned for the conduct set forth in plaintiffs' motion. Additionally, plaintiffs request that this court impose additional sanctions on the Executive Office of the President and its counsel and an award of attorneys' fees and costs to plaintiffs. Finally, plaintiffs seek to exclude Sally Paxton, Special Associate White House Counsel, and

---

1. Plaintiffs also requested that the motion be considered as a "Third Supplement to Plaintiffs' Motion for a Protective Order." By order dated April 10, 1998, this court stated that this third supplement would not be considered in connection with the protective order motion.

**30**

David Cohen, counsel for Craig Livingstone, from future depositions in this case.

## II. *Motion to Intervene on Behalf of President Clinton*

In response to plaintiffs' motion to compel, the law firms of Williams & Connolly and Skadden, Arps, Slate, Meagher & Flom, LLP ("Skadden, Arps") filed a motion to intervene on behalf of President Clinton. Williams & Connolly and Skadden, Arps request leave to intervene on behalf of President Clinton in order to preserve their client's attorney-client privilege and work product protection. These law firms also seek the entry of a protective order preventing plaintiffs from taking certain discovery from non-party witness Terry Lenzner in violation of President Clinton's attorney-client privilege and work product protection and denying plaintiffs' motion to compel in that respect.

Williams & Connolly and Skadden, Arps filed the motion to intervene and for protective order in response to certain questions posed to Terry Lenzner during the deposition conducted by plaintiffs' counsel in this matter. These firms retained Terry Lenzner and his corporation Investigative Group International, Inc. ("IGI") "in defense of matters relating to the President," Press Release of February 24, 1998, including so-called "Whitewater" matters and the lawsuit filed against the President by Paula Jones. These firms state that plaintiffs seek materials and testimony from Lenzner, who was deposed by plaintiffs on March 13, 1998, concerning the representation and defense of the President on matters unrelated to this case. For this reason, Williams & Connolly and Skadden, Arps seek to intervene on behalf of the President to preserve the President's attorney-client privilege and the protections afforded by the work product doctrine. It is their position that to the extent plaintiffs seek information covered by the President's privileges, the President's lawyers should be permitted to intervene in this action on behalf of their client for the purpose of preserving those privileges.

Plaintiffs oppose the motion to intervene and the motion for a protective order on several grounds. Plaintiffs contend that Williams & Connolly and Skadden, Arps should be precluded from representing President Clinton and his interests in this matter for the following reasons: (1) it is likely that lawyers from Williams & Connolly and Skadden, Arps will be necessary witnesses in this matter; (2) it is likely that the professional judgment of the lawyers from these firms working on this matter will be adversely effected by their personal interests; and (3) it would be inappropriate for lawyers from these firms to represent both President and Mrs. Clinton in this matter.

■■■ The court premises its analysis of this issue by noting that courts typically permit *parties* to intervene to preserve claims of privilege. Rule 24(a)(2) permits intervention as of right where "the *applicant* claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Fed.R.Civ.P. 24(a)(2) (emphasis added). This rule has been interpreted to permit intervention in discovery disputes *by parties* when the requirements of the rule have been met. *See United States v. American Tel. and Tel. Co.*, 642 F.2d 1285 (D.C.Cir.1980). In *American Tel. and Tel.*, MCI Telecommunications Corp. ("MCI") sought reversal of an interlocutory discovery order requiring the government to accede to AT & T's discovery request for certain documents which the government received from MCI and in which MCI claimed a work product privilege, and the district court's denial of MCI's motion to intervene for the purpose of asserting its claim of work product privilege in the documents requested by AT & T. *Id.* at 1287. In reversing the district court's denial of MCI's motion to intervene, the Court of Appeals for the District of Columbia Circuit stated that intervention was permissible under Rule 24(a)(2) of the Federal Rules of Civil Procedure. The Court of Appeals explained that "[w]ithout the right to intervene in discovery proceedings, a *third party* with a claim of privilege in otherwise discoverable materials could suffer 'the obvious

injustice of having his claim erased or impaired by the court's adjudication without ever being heard.'" *Id.* at 1292 (emphasis added) (quoting *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386 U.S. 129, 145, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967) (Stewart, J., dissenting)). The Court of Appeals concluded that MCI had "claimed an interest relating to the property or transaction which [was] the subject of [the] discovery action, and that the discovery order [of the district court] would impair that interest." *Id.* at 1293.

In the instant case, President Clinton is the appropriate party entitled to intervene to preserve the protections afforded by the attorney-client privilege and the work product doctrine. Only the President can demonstrate the interest in the property or transaction which is asserted by his counsel and is the subject of the discovery dispute at issue—not law firms or attorneys attempting to intervene on his behalf.

Through the filings of Williams & Connolly and Skadden, Arps, the President's attorneys have sought to preserve the protections afforded by the attorney-client privilege and the work product doctrine. Indeed, it would be manifestly unjust if this court were to grant plaintiffs' motion to compel with respect to Lenzner and force the disclosure of materials covered by some evidentiary privilege held by President Clinton without permitting the President to intervene in this discovery dispute and present any applicable claims of privilege if a motion to intervene had been filed by the President. In such a case, a denial of intervention would clearly "impair or impede [the President's] ability to protect that interest." Fed.R.Civ.P. 24(a)(2).

Rule 24(a)(2) also specifies that intervention as of right will not be granted if the applicant's interest is "adequately represented by existing parties." Fed.R.Civ.P. 24(a)(2). *See American Tel. and Tel.*, 642 F.2d at 1293. The Court of Appeals has stated that "the burden is on those opposing intervention to show that representation for the absentee will be adequate." *Id.* Moreover, the Court of Appeals indicated that "[a]dequacy of representation must be assessed in relation to the specific purpose that

intervention will serve." *Id.* Plaintiffs have made absolutely no showing that President Clinton's interests would be adequately represented in the absence of intervention.

In *American Tel. and Tel.*, AT & T sought a specific database which had been furnished to the government by MCI. The Court of Appeals noted that the government appeared to have provided adequate representation in that case at the district court level as it asserted MCI's claim and successfully requested that the Special Masters in that case allow MCI to present its views directly to them. *Id.* Nonetheless, the Court of Appeals determined that a serious difference in interests emerged between the government and MCI when an appeal from the district court ruling came into consideration because the government had no interest in appealing the district court's decision on the issue of whether the work-product documents were to be produced.

In the instant case, it could be asserted that the interests of the President were adequately represented by Lenzner. However, the interests at issue in this case are distinguishable from the interests in *American Tel. and Tel.* because if the President filed a motion to intervene, he would not seek to invoke any specific privileges with respect to one particular set of documents. There are a broad range of deposition questions and document requests that potentially implicate various evidentiary privileges that would not be adequately preserved if the court were to deny the President leave to intervene in this matter were he to file such a motion.

Turning to the first of three specific objections raised by plaintiffs with respect to Williams & Connolly's and Skadden, Arps' representation of the President in this matter, plaintiffs contend that lawyers from these firms are likely to be necessary witnesses in this case and this precludes these firms from representing the President in this case. Plaintiffs invoke Rule 3.7 of the District of Columbia Rules of Professional Conduct in support of this position. This rule provides that "[a] lawyer shall not act as an advocate in a trial in which another lawyer in the lawyer's firm is likely to be a necessary

**32**

witness ..." D.C.Rule 3.7(a). While this rule clearly applies to trial counsel, "it does not by its terms disqualify members of a potential lawyer-witness's firm from representing the client" throughout the pretrial stages of litigation. *Canfield v. Stone,* 1993 WL 468451, *1 (D.D.C. Oct. 25, 1993) (construing identical language in Rule 3.7(b)). Notwithstanding plaintiffs' theories of how counsel for these firms could be necessary witnesses in this case, plaintiffs have failed to address the applicability of this rule at this juncture of the case. Accordingly, the court is presented with absolutely no reason to invoke Rule 3.7 to preclude attorneys from either Williams & Connolly or Skadden, Arps from representing the interests of both President Clinton and Mrs. Clinton at this time.

■ Second, plaintiffs turn to Rule 1.7 of the District of Columbia Rules of Professional Conduct in support of their position that the professional judgment of Williams & Connolly's and Skadden, Arps' lawyers is likely to be adversely affected by their personal interests. Rule 1.7 provides that "a lawyer shall not represent a client with respect to a matter if ... [t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's ... own financial, business, property, or personal interests." D.C.Rule 1.7(b)(4).

Plaintiffs contend that Rule 1.7 is implicated because "if Lenzner reveals that he and IGI engaged in improper conduct at the direction of Williams & Connolly and Skadden, Arps without any culpable involvement of the President ... it could be in the best interest of the President to have such information revealed by Lenzner ... [and] it could obviously be in the best interest of these law firms if Lenzner did *not* reveal such information." Pls.' Opp. to Mot. to Intervene at 11. The court notes that even if plaintiffs had standing to make this assertion as a result of the alleged conflict between counsel and the represented parties, plaintiffs have provided absolutely no evidence that such a conflict exists. Their bare theories are supported by no facts whatsoever and fail to convince this court that the terms of Rule 1.7(b)(4) are implicated.

Finally, plaintiffs contend that lawyers from Williams & Connolly and Skadden, Arps cannot represent both President Clinton and Mrs. Clinton simultaneously in this matter. Plaintiffs again rely on the language of Rule 1.7 of the District of Columbia Code of Professional Conduct in support of this argument. Plaintiffs present various hypothetical situations which could potentially arise and state that these situations implicate the rule prohibiting the representation of clients in the same case with adverse interests. Again, even assuming the plaintiffs had standing to make such a claim, plaintiffs submit no evidence of any conflict between the President and Mrs. Clinton in this matter.

Plaintiffs have failed to present this court with any reason to justify excluding Williams & Connolly and Skadden, Arps from representing the President in this matter. Plaintiffs' opposition to the motion to intervene can be described as nothing more than a tactical effort at best designed to eliminate certain counsel and they have failed to carry their heavy burden at this stage in the case. However, it is the conclusion of the court that President Clinton is the party that must seek leave to intervene in this matter and not law firms acting on his behalf. If counsel for the President conclude that specific matters that arise in the future require the President to assert some evidentiary privilege, the President, in his own name, may file a motion for leave to intervene at that time. It must also be noted that because the court reaches no conclusion at this time on the one instance in which Lenzner asserted an evidentiary privilege, the President is not affected by the outcome reached by the court. For these reasons, the motion of Williams & Connolly and Skadden, Arps for leave to intervene on behalf of the President is denied.

■ The court also concludes that, in any event, the motion for protective order which seeks a broad prohibition against permitting plaintiffs to ask questions of or obtain documents from Lenzner that are protected from disclosure by President Clinton's attorney-client privilege and/or work product protection must be denied. In the event that plaintiffs have requested or will request such

information in the future, the court will separately consider the specific requests at issue to determine whether any evidentiary privileges, if asserted, are applicable.

### III. *Plaintiffs' Motion to Compel*

Plaintiffs' primary claim focuses on the adequacy of the production of documents pursuant to subpoenas to Stephanopoulos, Carville, Begala, and Lenzner and the assertion of certain evidentiary privileges during the deposition testimony of these witnesses and the deposition testimony of Parker. These claims will be considered separately with respect to each deposition witness. Plaintiffs' request for sanctions and to have Paxton and Cohen excluded from future depositions will also be discussed separately from the issues of document production and the assertion of evidentiary privileges.

### A. *Document Production Issues*

#### 1. *George Stephanopoulos*

Plaintiffs contend that Stephanopoulos failed to produce any relevant documents at his deposition pursuant to the request for documents served on him by plaintiffs despite the fact that such production was required. Plaintiffs assert that the testimony given by Stephanopoulos during the March 9, 1998 deposition clearly establishes that not only does Stephanopoulos possess documents responsive to plaintiffs' request for documents, but that he also failed to conduct any search for such documents prior to his deposition. Furthermore, plaintiffs attempt to refute claims that Stephanopoulos properly objected to the production of responsive documents and therefore, assert that he waived all objections to production of these documents.

 Turning first to the issue of whether Stephanopoulos waived all objections to the production of documents, plaintiffs contend that the fourteen day time limit to object to the production of documents began to run from February 22, 1998, the service date of the original subpoena. It is undisputed that Stephanopoulos failed to object until March 11, 1998 and produced no relevant documents at his deposition on March 9, 1998. For this reason, plaintiffs request that Stephanopoulos be compelled to specifically search for documents responsive to plaintiffs' subpoena, to produce any and all responsive documents, to make himself available again for deposition to describe his efforts to locate and produce responsive documents, to submit to further questioning about responsive documents he has located, and to pay plaintiffs' attorneys' fees and costs.

In contrast, Stephanopoulos contends that he possesses no responsive documents, and he asserts that he timely transmitted his objections to the document requests to plaintiffs. Stephanopoulos claims that he was served with the actual subpoena in question on March 5, 1998. Stephanopoulos states that on March 3, 1998, plaintiffs superseded a previous subpoena by serving him with a re-notice of deposition and then on March 5, 1998, superseded the re-notice with a corrected re-notice of deposition. Based on these facts, Stephanopoulos contends that the time to object to the operative subpoena ran from March 5, 1998 and as such, the written objections delivered to counsel for plaintiffs on March 11, 1998, two days after his deposition, were timely. Alternatively, Stephanopoulos asserts that if this court concludes that the fourteen day time limit began to run from February 22, 1998, unique circumstances exist to support a flexible application of the fourteen day limitation.

 Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure provides in relevant part:

> [A] person commanded to produce and permit inspection and copying [of documents] may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises.

Fed.R.Civ.P. 45(c)(2)(B). Thus, according to Rule 45(c)(2)(B), a non-party served with a subpoena requesting the production of documents must serve any objection in writing to the requesting party's counsel within 14 days

of service of the subpoena *or* prior to the time specified for compliance if compliance is required less than 14 days after service. Moreover, "[t]he failure to serve written objections to a subpoena within the time frame specified by Rule 45(c)(2)(B) typically constitutes a waiver of such objections." *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 48 (S.D.N.Y.1996). However, "[i]n unusual circumstances and for good cause . . . the failure to act timely will not bar consideration of objections." *Id.* (quoting *Semtek Int'l, Inc. v. Merkuriy Ltd.*, 1996 WL 238538, at *2 (N.D.N.Y. May 1, 1996)). Courts have found such unusual circumstances where:

> (1) the subpoena is overbroad on its face and exceeds the bounds of fair discovery; . . . (2) the subpoenaed witness is a nonparty acting in good faith; . . . and (3) counsel for witness and counsel for subpoenaing party were in contact concerning the witness' compliance prior to the time the witness challenged legal basis for the subpoena.

*Id.* (citations and quotations omitted).

In consideration of whether a subpoena places an undue burden on the party subpoenaed, it has been stated that "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed" should be considered. *United States v. International Business Machines Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y.1979).

Under a plain reading of the text of Rule 45(c)(2)(B), it is apparent that Stephanopoulos failed to comply with the requirements of that rule regardless of when the time to object began to run. If the subpoena began to run on February 22, 1998, as plaintiffs assert, then objections would have been due by March 9, 1998. However, if the time to object did not begin to run until March 5, 1998, as Stephanopoulos contends, then the objections would have been due prior to the date of compliance—March 9, 1998.

Although disputed by the parties, the facts surrounding the service of the subpoena duces tecum are as follows. On February 22, 1998, a subpoena was served on Stephano-

poulos setting a deposition date of March 4, 1998. Pls.' Reply Ex. 1 (Affidavit of process server). Attached to this subpoena was a schedule of documents that Stephanopoulos was ordered to produce at the deposition.

According to the terms of the letter sent from counsel for Stephanopoulos to counsel for plaintiffs, plaintiffs agreed to reschedule the deposition of Stephanopoulos from March 4 to March 9, 1998 due to Stephanopoulos' "various other previous commitments." Pls.' Reply Ex. 3. In conjunction with this rescheduling, a Re–Notice of Deposition Duces Tecum was served upon Stephanopoulos on March 3, 1998. On March 5, 1998, a Corrected Re–Notice of Deposition Duces Tecum was served upon Stephanopoulos. This document contained five additional requests for documents bringing the total number of requests for documents to be produced by Stephanopoulos to 38. On March 9, 1998, Stephanopoulos was deposed by counsel for plaintiffs, and on March 11, 1998, Stephanopoulos filed his objections to the schedule of documents contained in plaintiffs' Corrected Re-notice of Deposition Duces Tecum.

■ At issue, therefore, is the date by which Stephanopoulos should have filed his objections to the document requests presented in plaintiffs' subpoena duces tecum. It is the conclusion of this court that in order to be in compliance with the requirements of Rule 45, Stephanopoulos should have objected to the schedule of documents contained in the February 22, 1998 notice of deposition duces tecum by March 9, 1998. Accordingly, any objections filed on March 11, 1998 to the document requests contained in that notice were untimely and were thereby waived as to all requests with the exception of request numbers 3, 34, and 35. *Concord Boat Corp.*, 169 F.R.D. at 48.

Request numbers 3, 34, and 35 implicate the factors set forth in *Concord Boat* and warrant consideration of the objections filed in response to the document requests found in the original February 22, 1998 notice of deposition as timely. *Id.* Request number 3 requires Stephanopoulos to produce "[any and all calendars, desk calendars, appointment books, journals, logs or diaries created

or maintained by or for George Stephanopoulos.]" Stephanopoulos objected to this request on the grounds that it is "overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence." Letter of March 11, 1998 from Stanley Brand to Larry Klayman at 2.

On its face, this request is clearly over broad. The request is not limited to materials that may be relevant or lead to the production of admissible evidence nor is it restricted to the relevant time period. When these facts are combined with Stephanopoulos' status as a non-party in this matter, it is clear an inflexible reading of Rule 45(c)(2)(B) is not appropriate with respect to this request. Accordingly, Stephanopoulos' objections to this request will be considered timely.

Request numbers 34 and 35 [2] seek all records and documents related to either this case or Filegate in general. The court has previously determined with respect to other requests for documents in this case that have contained identical language that these requests are over broad and impermissibly vague. The witness should not be required to determine the precise contours of plaintiffs' requests and that is exactly what these requests would necessitate. As with request number 3, the requirements of *Concord Boat* are met and Stephanopoulos' objections to these requests will be considered timely. For these reasons, he is not required to respond to these requests as the requests are over broad and impermissibly vague.

With respect to the remaining objections, even if this court were to give consideration to these objections due to the changing nature of the document requests submitted by plaintiffs, the court must note that these objections are without merit. Stephanopoulos objects to every document request on the grounds that the requests are overly broad and unduly burdensome. These objections are frivolous and demonstrate that Stephanopoulos failed to take this request for documents seriously. Plaintiffs' initial schedule of documents requests the production of specific categories of documents clearly related to the Filegate matter. The document requests typically require the production of correspondence between Stephanopoulos and other individuals or entities pertaining to the alleged acquisition and misuse of FBI files. These document requests are limited in subject matter and by their terms, focus on the time period relevant to this case. Accordingly, Stephanopoulos' objections that the documents requested by plaintiffs are unduly burdensome, over broad, or not reasonably calculated to lead to admissible evidence are without merit.[3]

The picture becomes somewhat less clear when objections to the additional requests contained in plaintiffs' Corrected Re-notice of Deposition are considered. The remaining requests are as follows: request number 15—"Any and all records, correspondence, notes, communications, or other documents concerning or relating to efforts to gather information about and/or take any action concerning persons or entities considered to be adverse to or who have brought lawsuits against, and/or are investigating President Clinton, Mrs. Hillary Rodham Clinton, employees or agents of the Clinton Administration, and the Clinton Administration"; request number 34—"Any and all records, correspondence, notes, communications or other documents concerning or relating to communications to or from Terry Lenzner concerning access to and disclosure of FBI background investigation files or summary

---

2. Request numbers 34 and 35 correspond to request numbers 37 and 38 in the Corrected Re-notice of Deposition.

3. Stephanopoulos also raises a number of "General Objections" to the document requests at issue. These General Objections pertain to responsive documents that may be subject to the attorney-client privilege, the work product doctrine, requests that subject Stephanopoulos to harassment, undue burden, and expense without eliciting or leading to the discovery of admissible

evidence, and to the extent that the documents seek publically available documents. Stephanopoulos also objects to the document requests to the extent that they seek to require information or impose obligations beyond those permitted by the applicable Federal Rules of Civil Procedure.

Stephanopoulos' objections based on undue burden, harassment, and over breadth are duplicative of his specific objections which the court has considered. As to the other objections raised by Stephanopoulos, they are rejected.

reports on former Reagan and Bush Administration appointees and employees, or others"; request number 35—"Any and all records, correspondence, notes, communications or other documents concerning or relating to communications to or from any literary agent, publisher, and/or publisher's agent concerning or relating to the access to and disclosure of FBI background investigation files or summary reports [ ] on former Reagan and Bush Administration appointees and employees, or others"; and request number 36—"Any and all records, correspondence, notes, communications or other documents concerning or relating to any manuscript(s), including the manuscript(s) being prepared, or already prepared, for publication, in whatever media by Mr. George Stephanopoulos."

 By the terms of Rule 45(c)(2)(B), Stephanopoulos should have objected to the additional requests in the March 5, 1998 Corrected Re-notice of Deposition prior to the date that these documents were to be produced. *See* Fed.R.Civ.P. 45(c)(2)(b) ("[A] person commanded to produce and permit inspection and copying [of documents] may . . . before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection . . ."). However, Stephanopoulos failed to object to these requests until after the time for production had passed. Given the unreasonably short period of time between the service of the Corrected Re-notice of Deposition containing the four *additional* requests for documents and the time for production of these documents, a flexible reading of Rule 45(c)(2)(B) is warranted with respect to the objections to these requests and these objections will be considered.

 Stephanopoulos objects to document request number 15 which seeks correspondence, notes, etc. regarding attempts to obtain information on parties adverse to the Clinton Administration. This request is objected on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. The court agrees that this request is over broad. Plaintiffs have placed no time

parameters on this request and as stated, it is not the role of a witness to define the scope of a document request. Moreover, the word "adverse" is simply too broad and undefined to permit Stephanopoulos to conduct a reasonable search for responsive documents.

 Stephanopoulos raises similar objections to request number 34 which seeks records, correspondence, etc. relating to communications to or from Terry Lenzner concerning the access to and disclosure of FBI background investigation files on Reagan and Bush appointees. This request for documents could not be more specific and it is beyond the comprehension of this court how Stephanopoulos could consider this request over broad or unduly burdensome. The request is self-limiting with respect to both time and subject matter. Therefore, the objections with respect to this document request must be rejected.

The remaining two requests for documents, request numbers 35 and 36 of the Corrected Re-notice of Deposition, deal primarily with literary efforts undertaken by Stephanopoulos. Request number 35 requires the production of correspondence, notes, etc. to or from literary agents or publishers concerning access to and disclosure of FBI files of Reagan and Bush appointees. Stephanopoulos objects to this request on the grounds that it is overly broad and unduly burdensome. Clearly, this objection is without merit. The request is specific in both subject matter and as with other requests, the terms of the request limit the request to the time period relevant to this case.

 The final remaining request for documents, request number 36, seeks all records, correspondence, etc. concerning or relating to manuscripts prepared or being prepared by Stephanopoulos. This request is over broad, as it would most likely require the production of documents the have no relevance to the issues in this case.

 Notwithstanding the issues pertaining to the objections raised by Stephanopoulos, plaintiffs' motion to compel is premised largely on the belief that Stephanopoulos

failed to conduct an adequate search for responsive documents. An examination of the deposition testimony of Stephanopoulos leads to the inevitable and overwhelming conclusion that Stephanopoulos did indeed fail to conduct any search for responsive documents in this case.

The following exchanges between counsel for plaintiffs, Larry Klayman, and Stephanopoulos, aptly illustrates this conclusion:

[Klayman]: Look at request number three, which asks for any and all calendars, appointment books, journals, logs or diaries created or maintained by or for George Stephanopoulos ... You haven't produced those, have you Mr. Stephanopoulos?

[Witness]: I don't—I think I produced everything relevant. I don't have anything relevant to the FBI.

[Klayman]: Well, I didn't ask that. We asked for calendars, desk diaries, [etc.]. Now, you just admitted that you have those documents, don't you?

[Witness]: I may have some of them.

[Klayman]: You haven't produced them to Judicial Watch, have you? You don't have them here today, do you?

[Witness]: I don't have anything here today, no.... I'd be happy to go back and check again. I said I may have some.

Stephanopoulos Dep. at 76–77.

Perhaps even more telling was Stephanopoulos' responses when questioned by plaintiffs' counsel regarding the extent of Stephanopoulos' search for responsive documents.

[Klayman]: The bottom line here is you simply told [your attorney] "I don't have anything that responsive." Correct? And you didn't do a check.

[Witness]: No, I checked ... I have checked my files several times. I do not have any.

[Klayman]: But not in response to Judicial Watch's subpoena?

[Witness]: I have checked my files several times. I do not have any.

[Klayman]: You didn't check them in response to Judicial Watch's subpoena?

[Witness]: I have checked my files several times. I don't have anything.

[Klayman]: Not in response to Judicial Watch's subpoena, correct?

[Witness]: I have checked my files several times. I don't have anything.

[Klayman]: Yes or no with regard to our subpoena?

[Witness]: I have checked my files several times. I don't have anything.

[Klayman]: You don't want to answer that question?

[Witness]: I said I have checked my files several times pursuant to the subpoena and I don't have any.

[Klayman]: Did you check them with regard to Judicial Watch's subpoena that you received?

[Witness]: I have checked—

[Klayman]: When did you do that?

[Witness]: I don't know.

[Klayman]: When did you do that?

[Witness]: I have checked my files several times. I don't have anything.

[Klayman]: What day did you check them?

[Witness]: I don't remember.

Stephanopoulos Dep. at 78–80.

A similar colloquy followed every question addressing Stephanopoulos' search for responsive documents.

[Klayman]: Did you specifically check you files with regard to ... request [number 5]?

[Witness]: Yes.

[Klayman]: When was that?

[Witness]: I don't remember.

*Id.* at 81. Each time plaintiffs' counsel questioned Stephanopoulos regarding the search for potentially responsive documents, Stephanopoulos issued the standard response of not being able to remember when he searched for documents. Although he testified that he checked his files with regard to the particular document request at issue, when questioned he could not remember when the search had occurred. *See, e.g., id.* at 80–85, 93–97, 133–36. Given the fact that the subpoena duces tecum was served on February 22, 1998 and the deposition occurred merely

two weeks later on March 9, 1998, Stephanopoulos' claims of memory loss are simply not believable.[4]

■ This court's conclusion that Stephanopoulos' search for documents was inadequate bears no relation to the issue of whether responsive documents exist or are actually in the possession of Stephanopoulos. However, an individual served with a subpoena duces tecum has an obligation to conduct a reasonable search to ensure that non-privileged documents that are relevant or likely to lead to the discovery of admissible evidence are produced. Stephanopoulos has not met this obligation. Accordingly, Stephanopoulos is hereby ordered to conduct a reasonable search for documents responsive to the schedule of documents contained in the Corrected Re-notice of Deposition.[5] Furthermore, after such a search is conducted, Stephanopoulos shall submit to additional deposition questioning at a time and date to be set by plaintiffs to respond to questions pertaining to the search conducted and any responsive documents produced. Finally, it is this court's conclusion that Stephanopoulos must pay attorneys' fees and costs to plaintiffs arising in conjunction with the filing of this portion of plaintiffs' motion and the subsequent deposition to be conducted by plaintiffs for failing to comply with the subpoena duces tecum by not searching for relevant documents in a reasonable manner.

### 2. James Carville

■ The subpoena duces tecum issued to James Carville required him to produce documents at his deposition. Plaintiffs assert that Carville failed to object to the subpoena in a timely manner and therefore, any objections to the subpoena are waived. *See Con-*

*cord Boat Corp.*, 169 F.R.D. at 48. Plaintiffs further assert that Carville's deposition testimony reveals serious shortcomings in his search for responsive documents.

Plaintiffs allege that the shortcomings in Carville's search for documents is evidenced by his failure to search his residence in the Shenandoah Valley and Carville's belatedly advising plaintiffs that his corporation, EIP, Inc., possessed documents responsive to plaintiffs' subpoena. Plaintiffs request that this court compel Carville to conduct a thorough search for responsive documents at his Shenandoah Valley home/office, produce any documents from this home/office and from EIP, Inc., make himself available again for deposition to describe his efforts to locate and produce responsive documents, and submit to further questioning about any responsive documents he has located.

It is the conclusion of this court that plaintiffs' contentions regarding Carville's production of documents and objections to the production of documents are largely unfounded. In a letter dated March 20, 1998, counsel for Carville notified counsel for plaintiffs that "Mr. Carville now withdraws [the] objections [to the document requests] as moot." Pls.' Reply Ex. 1 (Letter of March 20, 1998 from William McDaniel and Jo Marsh to Larry Klayman). Furthermore, this letter states that Carville produced "all documents responsive to the subpoena dated February 20, 1998, and all documents responsive to the subpoena dated February 24, 1998, that were in his personal possession, custody, or control, including those documents which he objected to producing." *Id.* Plaintiffs have simply failed to refute this statement.

Plaintiffs' claims that Carville's deposition testimony reveals shortcomings in his compli-

---

**4.** The court is aware that in response to several questions, Stephanopoulos stated that he did not possess any relevant documents and that his search for relevant documents confirmed this. *See, e.g.,* Stephanopoulos Dep. at 17, 28, 67–68, 78. However, as demonstrated, his deposition testimony clearly suggests that no search was conducted. Moreover, Stephanopoulos failed to either address the adequacy of his search for documents or demonstrate why a specific search for documents would be unnecessary. Stephanopoulos' opposition to plaintiffs' motion to compel makes no mention of these issues whatsoever

despite the fact that plaintiffs specifically raised the issue of the adequacy of his search in their motion to compel. This leads the court to conclude that Stephanopoulos failed to conduct any search for responsive documents and did so without explanation, and that some of his deposition testimony on this point is not truthful.

**5.** Stephanopoulos is not required to search for documents responsive to document requests that this court has herein concluded to be over broad or impermissibly vague.

ance with the subpoena are equally without merit. During the course of the deposition, plaintiffs' counsel asked Carville whether he searched for each and every category of documents requested in the subpoena at issue. Carville Dep. at 17. Carville responded that he had conducted such a search. Additionally, although Carville admitted that he did not search his Shenandoah Valley home, during the course of the deposition he requested that an assistant conduct a search of the residence with this search revealing that no responsive documents were located at the residence. It is Carville's position that he has produced all documents responsive to plaintiffs' request and plaintiffs have provided no evidence to the contrary.

Plaintiffs also appear to inaccurately characterize the facts surrounding Carville's production of documents. Plaintiffs state that Carville's failure to search his home by the time of his deposition resulted, in part, in the filing of plaintiffs' motion to compel. Specifically, plaintiffs state that "Plaintiffs were not told by Carville under oath that he failed to find any responsive documents at his home until after Plaintiffs were forced to file their motion to compel." Pls.' Reply at 5. This is simply incorrect. During the course of the deposition, Carville testified that an assistant searched his home for responsive documents and this search failed to produce any relevant documents. Carville Dep. at 420. Plaintiffs misstate the facts surrounding Carville's search for documents.

As stated, plaintiffs also take issue with Carville's belated production of documents held by EIP, Inc. In the March 20, 1998 letter to plaintiffs' counsel, Carville's counsel indicated that Carville would voluntarily make available to plaintiffs all documents in the possession of EIP, Inc. of the type specified in the request for documents served on Carville. However, counsel for Carville also asserted that the request for documents served on him by plaintiffs contemplated documents held by Carville in his personal capacity and not documents held by his corporation. This argument is bolstered by the fact that the subpoena neither requests EIC, Inc. to produce responsive documents nor even mentions EIC, Inc. Indeed, correspon-

dence between the parties demonstrates that plaintiffs did eventually serve EIC, Inc. with a separate subpoena duces tecum on April 6, 1998.

Plaintiffs describe EIC, Inc. as the alter ego of Carville and contend that Carville should have produced responsive documents held by EIC, Inc. in response to the request for documents served on Carville. However, there is nothing in the record suggesting that EIC, Inc. is the alter ego of Carville and furthermore, plaintiffs have provided no evidence that Carville funneled documents to EIC, Inc. in order to avoid compliance with plaintiffs' requests for documents. Indeed, if that were the case, it would be unlikely that EIC, Inc. would voluntarily agree to permit plaintiffs' inspection of these documents.

Plaintiffs have sought to challenge Carville's production of documents with mere conjecture and surmise and have simply provided no evidence to refute the conclusions reached by the court. Accordingly, plaintiffs' motion to compel Carville to "conduct a thorough search for responsive documents at his Shenandoah Valley home/office, produce any and all responsive documents from both his Shenandoah Valley home/office and from EIP, Inc., make himself available again for deposition to describe his efforts to locate and produce responsive documents, as well as submit to further questions about responsive documents, he has located," Pls.' Mot. to Compel at 4, is denied.

### 3. *Paul Begala*

 Plaintiffs also contend that Begala failed to adequately search for and respond to plaintiffs' request for documents. Specifically, plaintiffs assert that "[t]here are serious and material contradictions between the sworn testimony of Begala and his assistant, Stacey Parker, concerning the production of documents." Pls.' Mot. to Compel at 4. According to plaintiffs, Begala "unambiguously" testified that neither he nor anyone else within the White House conducts research on perceived adversaries of the President or Mrs. Clinton. *Id.* (citing Begala Dep. at 113–15). In contrast, plaintiffs state that Begala's assistant, Stacey Parker, "unambiguous-

ly" testified that Begala did conduct such research. *Id.* (citing Parker Dep. at 274–75).

Specifically, plaintiffs cite portions of Parker's deposition in which she testifies that she maintained a file labeled "Opposition Research" and that she provided Begala with documents out of that file to produce at his deposition. *Id.* at 5. Plaintiffs state that the White House should be compelled to produce the "Opposition Research" file, and all other requested documents, and further request that the court compel Begala to submit to an additional deposition to respond to "material misstatements" made during his deposition and to be questioned regarding the "Opposition Research" file and any other relevant documents not yet produced. Plaintiffs also request that the court require the White House to pay attorneys' fees and costs. *Id.*

Upon a review of the deposition testimony of Begala and Parker, this court concludes that there are no inconsistencies between the deposition testimony cited by plaintiffs. Plaintiffs' claims that actions by the White House with respect to Begala's deposition "rais[e] . . . the specter of a lack of candor, if not perjury and obstruction of justice, on the part of the Clinton Administration," Pls.' Mot. to Compel at 5, are baseless and completely without merit. In support of the contention that Begala and Parker testified inconsistently, plaintiffs cite Begala's statement that no one in the White House is employed to gather information on perceived adversaries of the White House. Begala Dep. at 113–15. However, plaintiffs neglect to cite the numerous instances where Begala testified that he does collect information from public sources such as newspapers, prepared summaries, voting records, or budget proposals to be used when dealing with the press. *See id.* at 119 ("Clearly, I get news clippings about various political issues. So if that is what you mean, then certainly, yes."); *id.* at 124–25 ("I believe in research of the public records."); *id.* at 131 ("I draw a line between research, which I consider to be record research, that is public record research about public issues—and what, earlier in the day, you have talked about in terms of skeletons or digging up dirt. I don't believe in doing that. I don't participate in doing that."); *id.*

at 147–48 (responding to question of whether he was aware of anyone in the White House conducting research into perceived adversaries of the Clinton Administration and stating "No, sir. Again, by 'research,' I mean not public record of speeches, statements, votes on the Hill. That sort of work goes on all the time. It is part of the political process and having a public debate about issues.").

It is clear from the deposition of Begala that he draws a distinction between researching and compiling information from the public record and researching the private lives of individuals and acquiring information not found within the domain of the public record. Plaintiffs neglect to recognize the distinction drawn by Begala in his testimony and the result is the inaccurate claim that the testimony of Begala and Parker is inconsistent. However, a plain reading of the testimony plainly demonstrates otherwise.

Plaintiffs also state that Begala should be compelled to produce the "opposition research" file referred to in the deposition of Parker. Plaintiffs contend that this file should have been produced in response to document request number 15 which requests documents concerning efforts to gather information about individuals adverse to the Clinton Administration or who have brought lawsuits against the Administration. This request is facially over broad. It would require the responding party to speculate exactly whom plaintiffs consider to be adverse to the Clinton Administration and scour all possible records to determine who has brought lawsuits against the Administration without any specific relation to this case. Begala is not required to provide plaintiffs with additional responses to this request for this reason.

Accordingly, because plaintiffs fail to present any challenge to the objections presented by the Executive Office of the President ("EOP") to the document requests served on Begala aside from conclusory assertions, the *motion to compel and for sanctions with respect to Begala and the EOP is denied.*

### 4. *Terry Lenzner*

Plaintiffs also served a subpoena upon Terry Lenzner requiring him to produce docu-

ments at his deposition. Plaintiffs assert that Lenzner's search for responsive documents was inadequate and request that this court compel Lenzner "to search for all documents responsive to Plaintiffs' subpoena, produce any and all responsive documents, make himself available again for deposition to describe his efforts to locate and produce responsive documents, as well as to be questioned about responsive documents he has located, and pay Plaintiffs' attorneys' fees and costs." Pls.' Mot. to Compel at 6.

Plaintiffs present two arguments in support of the motion to compel with respect to Lenzner. Plaintiffs assert that the subpoena was issued to Lenzner in his capacity as Chairman of Investigating Group International, Inc. ("IGI"), and therefore, Lenzner should have searched for any responsive documents held by that corporation. According to plaintiffs, the subpoena required Lenzner to produce all responsive documents whether held by himself or IGI.

Plaintiffs also contend that Lenzner waived any objections to production by failing to object in a timely manner. This contention is based on plaintiffs' counsel's perception of the events preceding Lenzner's deposition. Prior to the deposition Lenzner requested that plaintiffs postpone his deposition and the production of documents based on his unavailability on the date originally selected by plaintiffs for the deposition—March 10, 1998. Plaintiffs argue that counsel for Lenzner misrepresented the reason for his unavailability. Plaintiffs state that they were led to believe that Lenzner was unavailable for the deposition because of business commitments when in reality, Lenzner was scheduled to leave for a family vacation on March 11, 1998, the day after the deposition was originally to be conducted. When the actual reason for Lenzner's unavailability was revealed, plaintiffs demanded that the deposition proceed without delay. Lenzner did not present his objections to the request for documents to plaintiffs until the eventual date of his deposition—March 13, 1998.

■ Turning first to plaintiffs' contention that Lenzner should be compelled to search for all responsive documents that may be in the possession of IGI, this contention is with-

out merit. While it is certainly true that the subpoena is addressed to "Mr. Terry F. Lenzner, Chairman," the subpoena itself neglects to indicate whether it requests the production of documents held in his personal capacity or as the custodian of IGI's documents. Pls.' Mot. to Compel Ex. 9 at 1. In addition to the fact that the subpoena fails to make this distinction, the subpoena is devoid of even the slightest suggestion that Lenzner should have produced responsive documents held by IGI. Indeed, the portion of the subpoena that plaintiffs have entitled as "Instructions" makes no mention of the production of documents held by IGI.

■ In cases where subpoenas fail to make the necessary distinction between production of documents held in a personal capacity or in the capacity of a custodian of documents, courts have construed the subpoena against the drafter. *See, e.g., In re Grand Jury Subpoenas Duces Tecum, August 1986,* 658 F.Supp. 474, 481 (D.Md.1987). In the case cited, the court considered a dispute surrounding the production of documents pursuant to grand jury subpoenas. The recipients of the subpoenas at issue contended that the subpoenas were directed to them in their individual capacity. In contrast, the government asserted that the subpoenas required the production of business records as well as personal records. The court noted that the subpoena "impart[ed] . . . an unclear direction," and also noted that the corporation was never directly subpoenaed. For these reasons, the court was compelled to conclude that the subpoena "must be construed against the drafter." *Id.* at 481.

Although the instant case involves a subpoena served in the context of a civil lawsuit, the same rule of construction must be applied. Plaintiffs had every opportunity to subpoena the corporation for the production of documents and request deposition testimony by a custodian of these documents. Instead, plaintiffs chose to rely solely on affixing the title "Chairman" after Lenzner's name on the subpoena as the sole ground to justify the production of documents held by the corporation. This is simply insufficient and this is certainly a case where ambiguity

should be construed against the drafter of the subpoena. Accordingly, this court will not compel Lenzner to produce any responsive documents that IGI may possess.

■■■ As stated, plaintiffs also assert that Lenzner waived all objections to the document requests contained in the subpoena. In a letter dated March 10, 1998, counsel for Lenzner confirmed the agreement between the parties to continue Lenzner's deposition from March 13, 1998 to March 25, 1998. Also included in that correspondence was confirmation of the agreement to permit Lenzner additional time to respond to plaintiffs' document requests. Opp. of Lenzner to Pls.' Mot. to Compel Ex. 1. As stated, plaintiffs' counsel immediately revoked the offer to continue the deposition by letter once plaintiffs' counsel learned that Lenzner would be unavailable due a personal vacation beginning on March 14, 1998. According to plaintiffs, this letter served to revoke both the continuation of the deposition and the extension of time within which to comply with and object to plaintiffs' request for documents.

Upon a review of the correspondence between the parties, the court is compelled to agree with plaintiffs that the repudiation of the agreement to postpone the deposition included a repudiation of the agreement to postpone the date by which to respond and object to the request for documents. However, counsel for Lenzner correctly suggests that the factors found in *Concord Boat* should be applied to the facts of this case to determine whether Lenzner's objections should nevertheless be considered. As stated previously, the court in *Concord Boat* relied on the following factors to make this determination: (1) whether the subpoena is over broad on its face and exceeds the bounds of fair discovery; (2) whether the subpoenaed witness is a non-party acting in good faith; and (3) whether counsel for the witness and counsel for the subpoenaing party were in contact concerning the witness' compliance prior to the time the witness challenged the legal basis for the subpoena.

In the instant case, the application of these factors leads to the conclusion that Lenzner's objections should be considered. Lenzner responded to all but three of plaintiffs' document requests by stating that he possessed no responsive documents. Lenzner objected to the remaining requests-request numbers 3, 15, and 16—and it is clear that these requests are facially over broad.

Request number 3 seeks "[a]ny and all calendars, desk calendars, appointment books, journals, logs or diaries created or maintained by or for Terry Lenzner." Pls.' Mot. to Compel Ex. 6 at 4. This request is essentially limitless and clearly over broad.

Request number 15 seeks "[a]ny and all records, correspondence, notes, communications or other documents concerning or relating to efforts to gather information about and/or take any action concerning persons or entities considered to be adverse to or who have brought lawsuits against and/or are investigating President Clinton, Mrs. Hillary Rodham Clinton, employees or agents of the Clinton Administration, and the Clinton Administration." *Id.* at 6–7. Request number 16 seeks "[a]ny and all records, correspondence, notes, communications *or other documents concerning or relating to* the acquisition, collection, compilation, recordation, dissemination, or disclosure of any materials created and/or maintained by any agency or entity of the Executive, Legislative, or Judicial Branches of the United States, any state, any foreign government or any international organization about any former employee or appointee of the Reagan or Bush Administration, current or any former employee or appointee of the Clinton Administration or any other person." *Id.* at 7. It is clear that these requests are over broad and vague. Lenzner should not be required to attempt to define the scope of plaintiffs' requests for documents. Indeed, request number 15 requires Lenzner to assess who is "adverse" to the President and other individuals or groups of individuals. Similarly, request number 16, read literally, would require Lenzner to search all three branches of the federal government and various other agencies and international organizations and to define what is included within the phrase "the acquisition, collection, compilation, recordation, dissemination, or disclosure of any materials."

The second and third factors of *Concord Boat* are also met with respect to the objections raised by Lenzner. In this case, Lenzner is a non-party acting in good faith. He appeared at the deposition as ordered by this court and responded to the document requests in what he perceived to be a timely manner. Finally, the correspondence between the parties indicates that counsel for Lenzner and counsel for plaintiffs' the subpoenaing party—were in contact concerning Lenzner's compliance prior to the time Lenzner filed his objections with plaintiffs.

Because the factors set forth in *Concord Boat* are met in this case, it is the conclusion of this court that Lenzner's objections must be considered, and with respect to request numbers 3, 15, and 16, Lenzner's objections are valid. Accordingly, plaintiffs' motion to compel Lenzner to search for all responsive documents, to produce such documents, and to submit to further deposition questioning about such documents is denied. Furthermore, plaintiffs' requests for sanctions and attorneys' fees are also denied with respect to Lenzner.

### B. *Claims of Privilege*

Plaintiffs have also moved this court to compel the witnesses in these depositions, Begala, Stephanopoulos, Carville, Lenzner, and Parker to answer questions posed during the depositions that either their own counsel or the counsel for the EOP objected to on the basis of certain evidentiary privileges including executive privilege, attorney client privilege and the work product doctrine, and the journalist/author privilege. In the motion to compel, plaintiffs cite particular instances in which it is claimed that the assertion of the evidentiary privilege at issue was improper. Accordingly, the court will confine its analysis to those instances specifically cited by plaintiffs. *See* Local Rule 107(b).

▬ Rule 26(b) of the Federal Rules of Civil Procedure requires the disclosure of requested information not privileged and reasonably calculated to lead to the discovery of admissible evidence. A motion to compel for failure to provide relevant information sought through discovery requires the court to determine if the materials or testimony sought are relevant to the action and whether all or part of the materials or testimony are covered by a privilege that prevents its disclosure. *See, e.g., Conant v. McCaffrey,* 1998 WL 164946 (N.D.Cal. March 16, 1998) ("To succeed on its motion to compel, the government must show that the information sought is relevant, and that it does not fall under the various privileges plaintiffs have asserted."); *Bacon v. Smith Barney Shearson, Inc.,* 938 F.Supp. 98, 104 (D.N.H.1996) ("The court finds and rules that the motion to compel must be denied, as it seeks information which is not relevant and not designed to lead to the discovery of admissible evidence within the purview of Rule 26(b)(1), Fed.R.Civ.P.").

#### 1. *Executive Privilege*

Plaintiffs contend that "[t]he Clinton Justice Department has repeatedly instructed witnesses not to answer questions based on frivolous claims of executive privilege." Mot. to Compel at 7. Moreover, plaintiffs assert that the government bears the burden of showing how the communications with presidential advisers occurred in conjunction with advising the President about official government operations in order to justify the invocation of the privilege. *Id.*

▬ The Court of Appeals for the District of Columbia Circuit recently laid out the contours of the presidential communications aspect of executive privilege in *In re Sealed Case,* 121 F.3d 729, 744 (D.C.Cir. 1997). In that case, the Court of Appeals stated "[t]he President can invoke the privilege when asked to produce documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *Id.* Prior to the consideration of the issue of whether this privilege has been properly invoked, the party seeking to compel the production of materials or testimony must make the some showing of relevance or a showing that the materials or testimony sought is likely to lead to the discovery of admissible evidence.

#### a. *Paul Begala*

▬ In their motion, plaintiffs make the claim that executive privilege has been im-

properly asserted with respect to certain portions of the testimony offered by Begala. Plaintiffs state that counsel for the EOP improperly asserted the claim of executive privilege when counsel for plaintiffs questioned Begala regarding his discussions with President Clinton immediately prior to Begala's rejoining the Clinton Administration in August 1997.

As stated, under the applicable legal standards, plaintiffs must make a preliminary showing of relevance or that the testimony sought is likely to lead to admissible evidence prior to the court's consideration of the issue of the assertion of executive privilege. It is the conclusion of this court that plaintiffs are not able to meet this burden. The testimony plaintiffs seek simply bears no possible relevance to the issues in this case and there is not even the slightest chance that it will lead to the discovery of admissible evidence.

Plaintiffs premise their theory of relevance on the belief that it is likely that Begala returned to the White House "to use FBI files and other sources to 'dig up dirt' on the Administration's adversaries and smear them in the media" and to " 'spin' the various scandals, including obviously, the 'Filegate' matter." Pls.' Mot. to Compel at 8–9. However, throughout his deposition, Begala repeatedly denies having access to or using FBI files to "smear" adversaries. Furthermore, Begala states that the only sources he relies upon for "opposition research" are readily obtainable news items found in the public fora. The EOP has also submitted the declaration of Charles F.C. Ruff, Counsel to the President in support of its opposition to plaintiffs' motion to compel. Ruff states that he is familiar with the content of the conversations between Begala and President Clinton that are the subject of plaintiffs' motion to compel and declares that "[t]he conversations which plaintiffs seek to delve into do not relate in any way to the allegations in plaintiffs' complaints, to any misuse of government files, or to any alleged misconduct whatsoever." Opp. of EOP to Pls.' Mot. to Compel Ex. E. at 3–4. Plaintiffs make no showing to rebut either the testimony of Begala or the declaration by Ruff, thereby compelling the conclusion that the information sought is not relevant or likely to lead to admissible evidence. Therefore, the motion to compel with respect to the deposition questions posed to Begala in response to which the EOP asserted executive privilege is denied based on the lack of relevancy of the testimony sought.

### b. *George Stephanopoulos*

Plaintiffs also contend that the EOP improperly asserted claims of Executive privilege with respect to two sets of questions posed to Stephanopoulos. In the first instance, counsel for plaintiffs questioned Stephanopoulos regarding the circumstances surrounding his job change in May 1993. Stephanopoulos Dep. at 167–70. Plaintiffs also dispute the claim of privilege asserted in conjunction with questions pertaining to conversations between Stephanopoulos and the President regarding the press release issued by FBI Director Louis Freeh concerning the Filegate matter in which Freeh referred to this matter as an "egregious violation[ ] of privacy." Stephanopoulos Dep. at 214–24.

■ The first set of questions posed to Stephanopoulos concerning the circumstances surrounding his change of position at the White House in May 1993 do not bear any relevance to the facts of this case which are alleged to have occurred after December 1993. Furthermore, when plaintiffs' counsel specifically questioned Stephanopoulos whether he was removed because of improper access to FBI files, Stephanopoulos answered that this was not the reason for his change in positions at the White House. *Id.* at 170. Plaintiffs make no showing of relevance with respect to any of the other questions posed to Stephanopoulos on this issue. For this reason, it is unnecessary to consider the issue of executive privilege and its relation to this line of questioning pursued by plaintiffs.

■ The second series of responses plaintiffs challenge pertain to questions concerning whether Stephanopoulos conversed with President Clinton or Rahm Emanuel regarding the Filegate matter. In particular, plaintiffs seek responses to questions regarding whether Stephanopoulos discussed FBI Director Freeh's press release of June

14, 1996 regarding the acquisition of FBI files by the White House. In response to the questions posed by counsel for plaintiffs, Stephanopoulos testified that he did not remember any specific conversations that he may have had with President Clinton or Emanuel regarding this press release or the Filegate matter. The issue of the contents of any communications Stephanopoulos may have had with President Clinton or Emanuel is mooted to the extent that Stephanopoulos has no specific recollection of any such conversations. Moreover, plaintiffs have made no showing that this lack of recollection is disingenuous or designed to avoid answering plaintiffs' counsel's questions.

Accordingly, it is not necessary for the court to consider the issue of executive privilege with respect to the deposition testimony of Stephanopoulos. Plaintiffs' motion to compel is therefore denied to the extent that it seeks to compel the production of this information.[6]

### 2. *Attorney–Client Privilege*

Plaintiffs contend that on numerous occasions, deponents and their counsel improperly invoked claims of attorney-client privilege in response to plaintiffs' counsel's questioning. Specifically, plaintiffs claim that "[c]ollectively, deponents and their counsel have abused the attorney-client privilege to prevent highly relevant testimony and obstruct orderly discovery." Pls.' Mot. to Compel at 12. Plaintiffs raise these claims with respect to certain portions of the testimony of Begala, Carville, Parker, Stephanopoulos, and Lenzner.

Attorney-client communications ordinarily are privileged, and thus are protected from discovery by a party opponent under Rule 26(b) of the Federal Rules of Civil Procedure. "The attorney-client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services." *Tax Analysts v. Internal Revenue Service*, 117 F.3d 607, 618 (D.C.Cir.1997). Specifically, information is protected by the privilege only if it relates to a fact conveyed to a lawyer by the client. *See United States v. Sayan*, 968 F.2d 55, 63 (D.C.Cir.1992) (citing *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C.Cir.1984). Furthermore, the privilege extends to communications from attorneys to their clients if the communications rest on confidential information obtained from the client. *Tax Analysts*, 117 F.3d at 618 (citing *In re Sealed Case*, 737 F.2d at 99). However, the mere fact that an individual communicates with an attorney does not make the communication privileged. *See, e.g., United States v. Costanzo*, 625 F.2d 465, 468 (3d Cir.1980) ("[I]t is true that a communication is not privileged simply because it is made by or to a person who happens to be a lawyer.") (quotations and citations omitted)). As with the assertion of other evidentiary privileges, the party seeking to compel the production of information claimed to be privileged must demonstrate the relevance of the information sought or make some showing that the information is likely to lead to the discovery of admissible evidence.

### a. *Paul Begala*

Plaintiffs contend that counsel for the EOP improperly asserted claims of attorney-client

**6.** The court must note that the parties asserting the various evidentiary privileges have improperly attempted to arrogate to themselves the ability to determine how the court will address the issues contained in plaintiffs' motion to compel. In many instances, the parties opposing the motion to compel contend that the specific questions to which plaintiffs seek to compel answers are not relevant to the issues in this case. Once plaintiffs filed their motion to compel, the parties opposing the motion should have requested that the court bifurcate the issues of relevance and the assertion of the applicable privileges if formal claims of the privilege were not going to be presented in opposition to plaintiffs' motion to

compel. If the parties fail to make this request in the future, the court may be disposed to deem the privileges asserted to have been waived by the parties.

Moreover, the court notes that the EOP has sought to invoke the Executive privilege without expressly stating that the President seeks to invoke this privilege. Although the court was not required to reach the merits of the claim of Executive privilege in this opinion, without either court-approved bifurcation or an express invocation of the privilege by the President in the future, the court will not consider additional claims of this privilege.

privilege in response to two sets of questions posed to Begala. Counsel for plaintiffs questioned Begala as to whether he discussed his pending deposition with anyone. After Begala responded that he mentioned his deposition to White House Counsel Charles Ruff, plaintiff's counsel asked Begala whether Ruff responded. At this point, counsel for the EOP objected to this question on the grounds that the answer was protected from disclosure under the attorney-client privilege. Begala Dep. at 52–53.

Plaintiffs' motion to compel an answer to this question is mooted by subsequent questioning during the deposition. In its opposition to plaintiffs' motion, the EOP correctly noted that counsel for plaintiffs pursued this line of questioning at a later point in the deposition and Begala responded to this questioning without the invocation of any privilege. Begala explained that Ruff did respond when Begala mentioned the deposition and that the response was brief. *Id.* at 128.

The second set of questions that form the subject of plaintiffs' motion to compel with respect to Begala concern a conversation between Begala, White House Press Secretary Mike McCurry, and members of the White House Counsel's Office. This conversation dealt with the White House's response to statements made by Joseph diGenova alleging that he and his wife were being investigated by private investigators with links to the White House. Counsel for the EOP objected to the questioning on the ground that it implicated information covered by the attorney-client privilege. *Id.* at 138–40.

The EOP contends that during the course of this conversation, McCurry was securing legal advice pertaining to the issuance of a statement regarding whether private investigators had in fact been hired by the White House. The EOP claims that McCurry was soliciting information for one of his core duties for which legal advice was necessary.

Opp. of EOP to Pls.' Mot. to Compel at 26–27.

 Whether the attorney-client privilege is applicable to this set of questions is not entirely clear from the limited deposition testimony provided. While plaintiffs make the conclusory assertion that the attorney-client privilege is not applicable with respect to these questions, the EOP makes a similarly conclusive claim to the contrary and simply states that McCurry was soliciting legal advice without any support for this statement.[7] While it is understandable that the EOP seeks to avoid the disclosure of privileged communications, the "knee-jerk" invocation of the attorney-client privilege and plaintiffs' refusal to pose alternate questions which may establish circumstantial facts permitting the court to determine the propriety of the assertion of the attorney-client privilege has placed this court in the inevitable position of attempting to rule on this issue in a vacuum. *See, e.g., Kaiser v. Mutual Life Ins. Co. of New York,* 161 F.R.D. 378, 380 (S.D.Ind.1994) ("Deponents are expected . . . to assert their objections during the deposition and to allow questioning parties to develop circumstantial facts in order to explore the propriety of the assertion of the privilege, immunity, or other objection."). This the court will not do. Accordingly, it is the conclusion of the court that plaintiffs may submit a set of narrowly tailored interrogatories to Begala regarding the conversations between Begala, McCurry, and White House counsel at issue and questions regarding whether the invocation of the attorney-client privilege is appropriate. Begala should fully support any claims of privilege in response to these interrogatories in a manner that permits the court to ascertain whether the privilege claimed applies if necessary. *See, e.g., Stabilus v. Haynsworth, Baldwin, Johnson and Greaves, P.A.,* 144 F.R.D. 258, 268 (E.D.Pa.1992) ("A general, unspecified objection to interrogatories on the ground of work product or attorney-client privilege is insuffi-

---

7. The court recognizes that the EOP submitted the declaration of Charles Ruff in which Ruff states that "[t]he conversations that plaintiffs seek to delve into do not relate in any way to the allegations in plaintiffs' complaints, to any misuse of government files, or to any alleged mis-

conduct whatsoever." Opp. of EOP Ex. E at 4. However, this declaration was submitted in support of the EOP claim that executive privilege should prevent disclosure of a separate set of conversations which did not implicate the attorney-client privilege.

client and improper.") (citing *In re Shopping Carts Antitrust Litigation,* 95 F.R.D. 299, 305 (S.D.N.Y.1982)).

### b. *James Carville*

██ Plaintiffs claim that "a similar attempt to invoke the privilege occurred during the Carville deposition, where inquiry was made into who helped him incorporate EIP, Inc., the 'Education and Information Project.'" Pls.' Mot. to Compel at 14. Plaintiffs contend that this inquiry was essential because it attempts to discover who are the "White House allies" to which Stephanopoulos referred in his statement about the imposition of the "Ellen Rometsch strategy." *Id.;* Carville Dep. at 379–80. Counsel for Carville refused to permit Carville to answer this question on the ground that the answer was protected by the attorney-client privilege.

Despite the assertions of plaintiffs, the court is simply not convinced by plaintiffs' argument that the information sought is relevant to the issues in this case or likely to lead to the discovery of admissible evidence. For this reason, plaintiffs' motion to compel responses to this line of questioning is denied.

### c. *Stacey Parker*

██ Plaintiffs assert that the EOP improperly invoked the attorney-client privilege during the deposition of Begala's assistant Stacey Parker. During the course of her deposition, counsel for plaintiffs questioned Parker regarding her search for documents in response to the subpoena duces tecum served on her by plaintiffs. Specifically, counsel for plaintiffs asked Parker whether instructions were provided to her by counsel pertaining to how to search for documents and whether she discussed the deposition testimony of Begala with counsel. Parker Dep. at 295; *id.* 29 and 151. Additionally, Parker was questioned as to whether counsel "went through each document" with her. *Id.* at 287. Plaintiffs claim that the privilege was invoked when no client communication was involved and was designed only to "obstruct relevant inquiry." Pls.' Mot. to Compel at 19.

It is evident from a review of the questions posed by counsel for plaintiffs that the questions sought to probe into the subject matter and substance of attorney-client communications. The court is persuaded by the reasoning employed by the EOP—"counsel for EOP properly instructed Ms. Parker not to answer detailed questions about what she did with counsel to prepare for her deposition because the disclosure of what she *did* with counsel would have been tantamount to revealing the substances of what was discussed with counsel." Opp. of EOP to Pls.' Mot. to Compel at 29. *See Elliott Associates, L.P. v. Republic of Peru,* 176 F.R.D. 93, 97 (S.D.N.Y.1997) ("[T]he line between general subject matter and specific details is not easily drawn, and it seems correct to assert that "general" questions may be pieced together to gain more specific knowledge about the legal advice sought or rendered."). *See also GPA, Inc. v. Liggett Group, Inc.,* 1995 WL 331796 (S.D.N.Y. June 5, 1995) (denying motion to compel answers to question of whether and when a party to the action showed a letter to his attorney since it was more than subject matter, would unavoidably disclose indirectly some of the details of privileged conversations, was not necessary to test the validity of the asserted privilege, and did not fall within the crime fraud exception). The answers sought by plaintiffs are covered by the attorney-client privilege and need not be disclosed.

### d. *George Stephanopoulos*

Plaintiffs cite the deposition of George Stephanopoulos as an example of "deponents and their counsel invok[ing] the privilege merely on the basis that an attorney was somehow involved." Pls.' Mot. to Compel at 16. During the deposition of Stephanopoulos, counsel for plaintiffs pursued a line of questioning regarding whether Stephanopoulos discussed the White House's reaction to the Filegate matter and its characterization of the matter as a mistake. Stephanopoulos Dep. at 214–216.

As with the deposition testimony of Begala, the deposition of Stephanopoulos fails to provide the court with sufficient information to ascertain whether the invocation of the attorney-client privilege was appropriate. Plaintiffs may submit a set of narrowly tai-

lored interrogatories to Stephanopoulos seeking information pertaining to this issue and whether the invocation of the attorney-client privilege was proper. Stephanopoulos should fully support any claims of privilege in response to these interrogatories in a manner that permits the court to ascertain whether the privilege claimed applies if necessary. *See, supra,* at 49.

e. *Terry Lenzner*

■ The final invocation of the attorney-client privilege challenged by plaintiffs surrounds the deposition testimony of Terry Lenzner. Plaintiffs questioned Lenzner regarding his production of documents and asked "[w]as it your understanding quite apart from anything your counsel might have said that you didn't have to produce documents today?" Lenzner Dep. at 19. After Lenzner responded that this was his understanding, counsel for plaintiffs asked how he reached this understanding. Counsel for Lenzner objected to this question to the extent that it required the disclosure of attorney-client communications.

As previously discussed in this opinion, the court resolved all issues pertaining to Lenzner's compliance with the request for the production of documents served on him by plaintiffs. The court's conclusions that Lenzner fully complied with the request for documents renders the questions posed by plaintiffs irrelevant to the issues in this case. Accordingly, plaintiffs' motion to compel is denied.

3. *Author's and Journalist's Privilege*

Plaintiffs object to the invocation of an author's and journalist's privilege during the course of the Stephanopoulos deposition in response to certain questions. Plaintiffs sought information pertaining to the book currently being written by Stephanopoulos and information surrounding his statement that unnamed White House allies were beginning to discuss the imposition of an "Ellen Rometsch strategy." Plaintiffs contend that the invocation of the privileges at issue were improper and that these privileges were inapplicable with respect to the questions posed to Stephanopoulos.

■ Plaintiffs' objections to the invocation of the author's privilege by counsel for Stephanopoulos can be quickly dismissed. The deposition testimony reveals that plaintiffs questioned Stephanopoulos regarding his recent literary efforts and in particular, regarding a book that he is currently writing. When counsel for plaintiffs asked Stephanopoulos whether he maintained notes during the process of writing his book, Stephanopoulos responded that he had "no notes on the FBI files for this book." Stephanopoulos Dep. at 108. However, after Stephanopoulos was questioned whether he had notes for the book "generally," counsel for Stephanopoulos invoked a journalist privilege. Specifically, counsel for Stephanopoulos stated that "[w]e're not going to permit you to question Mr. Stephanopoulos about his authorship of the book except with respect to the Filegate matter. He has a journalist privilege and he has a contract with his publisher that protects confidentiality of what he's doing." *Id.* at 108. In the opposition to plaintiffs' motion to compel, this motion was recharacterized as a privilege grounded in the First Amendment and extending to book authors who gather and disseminate information to the public.

Because plaintiffs have made no demonstration that the information sought is relevant to the issues in this case or a showing that the information is likely to lead to the discovery of admissible evidence, the court is not required to determine the precise contours of the privilege asserted by Stephanopoulos and how it may apply to this case. Stephanopoulos testified that he possessed no notes for his books pertaining to the Filegate matter. Whatever notes he may possess in "general," simply have no relevance to the issues in this case.

As stated, plaintiffs also seek to compel Stephanopoulos to answer questions regarding his statement that White House allies were engaging in an "Ellen Rometsch strategy." Historically, this strategy involved the use of information about political adversaries obtained from government files to the detriment of the adversaries. During the deposition of Stephanopoulos, plaintiffs questioned him regarding the source of the statements

referring to the "Ellen Rometsch strategy." Stephanopoulos continuously refused to answer questions about the sources of that statement and in sum, stated "[i]n this statement the White House allies are my sources [and] I'm, therefore, not going to talk about them." *Id.* at 305.

Plaintiffs assert that the journalist privilege asserted by Stephanopoulos is inapplicable in response to the series of questions at issue. Plaintiffs argue that Stephanopoulos should not be characterized as a journalist for purposes of the assertion of this privilege and that the assertion of the privilege is inapplicable in matters relating to criminal or tortious conduct. Plaintiffs describe Stephanopoulos as a material witness to illegal and improper activities and as such, plaintiffs assert that he must be compelled to testify about these matters.

In *Branzburg v. Hayes*, 408 U.S. 665, 707, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), the Supreme Court held that although a journalist does not have an absolute privilege under the First Amendment to refuse to disclose confidential sources to a grand jury conducting a criminal investigation, the journalist was not completely without protection under the First Amendment. In that case, the Court held that some level of First Amendment protection must be afforded to the press and its newsgathering activities.

The Court of Appeals for the District of Columbia Circuit commented on the breadth of the Supreme Court's decision in *Branzburg* in *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C.Cir.1981). The Court of Appeals stated "[a]lthough *Branzburg* may limit the scope of the reporter's First Amendment privilege in criminal proceedings, this circuit has previously held that in civil cases, where the public interest in effective criminal law enforcement is absent, that case is not controlling." *Id.* (citing *Carey v. Hume*, 492 F.2d 631, 636 (D.C.Cir.1974)). The Court of Appeals explained that "to determine whether the privilege applies courts should look to the facts of each case, weighing the public interest in protecting the reporter's sources against the private interest in compelling disclosure." *Id.* The standard must be interpreted in the context of additional language contained in that opinion:

> In general, when striking the balance between the civil litigant's interest in compelled disclosure and the public interest in protecting a newspaper's confidential sources, we will be mindful of the preferred position of the First Amendment and the importance of a vigorous press. Efforts will be taken to minimize impingement upon the reporter's ability to gather news ... Thus in the ordinary case the civil litigant's interest in disclosure should yield to the journalist's privilege. Indeed, if the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished. Unless potential sources are confident that compelled disclosure is unlikely, they will be reluctant to disclose any confidential information to reporters.

*Id.* at 712.

Several factors can be distilled from the Court of Appeals' decisions in *Zerilli* and *Carey* to be used when considering whether a journalistic privilege should apply in the context of a civil lawsuit. First, a high degree of relevance is required and the sources' identities must go to the very heart of the plaintiffs' claim. *Carey*, 492 F.2d at 634 (quoting *Garland v. Torre*, 259 F.2d 545 (2d Cir.1958)). Second, "[e]ven when the information is crucial to a litigant's case, reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information." *Zerilli*, 656 F.2d at 713. Finally, "[a] distinction can also be drawn between civil cases in which the reporter is a party, as in a libel action, and cases in which the reporter is not a party." *Id.* at 714.

As the party claiming the protection of the journalistic privilege, the burden is on Stephanopoulos "to establish those facts that are the essential elements of the privileged relationship." *In re Grand Jury Subpoena Dated January 4, 1984*, 750 F.2d 223, 224 (2d Cir.1984). As a preliminary matter, the court must consider plaintiffs' arguments that Stephanopoulos should not be considered a journalist, thereby eliminating the

availability of the privilege with respect to his sources. The Court of Appeals for the Second Circuit has stated that "whether a person is a journalist, and thus protected by the privilege, must be determined by the person's intent at the inception of the information-gathering process." *von Bulow v. von Bulow*, 811 F.2d 136, 142 (2d Cir.1987). However, the court added that "an individual successfully may assert the journalist's privilege if he is involved in activities associated with gathering and dissemination of news, even though he may not ordinarily be a member of the institutionalized press." *Id.*

In *von Bulow*, the court held that "the individual claiming the privilege must demonstrate, through competent evidence, the intent to use material—sought, gathered, or received—to disseminate information to the public and that such intent existed at the inception of the newsgathering process. This requires an intent-based factual inquiry to be made by the district court." *Id.* at 144. In making this intent based inquiry, the court noted that "prior experience as a professional journalist may be persuasive evidence of present intent to gather for the purpose of dissemination" and that "[t]he primary relationship between the one seeking to invoke the privilege and his sources must have as its basis the intent to disseminate the information to the public garnered from that relationship." *Id.* at 144–45.

Stephanopoulos makes an adequate showing that at the time he acquired the information from the sources at issue his intent was to disseminate the information to the public. In support of his assertion of the journalist privilege, Stephanopoulos has submitted the affidavit of Richard C. Wald, Senior Vice–President of ABC News. This affidavit states that Stephanopoulos has been employed in a journalistic capacity by ABC News since January 1997. Stephanopoulos Opp. to Pls.' Mot. to Compel Ex. A at 1. Wald also states that Stephanopoulos' duties in this capacity include regular appearances as a news commentator and news analyst on the ABC News Sunday morning interview and analysis program *This Week with Sam Donaldson and Cokie Roberts* and frequent appearances as a news commentator and news analyst on other ABC News programs. When this affidavit is combined with the fact that Stephanopoulos did disseminate the information garnered from the sources to the public, the court is able to conclude that his intent at the time of gathering the information was to disclose it to the public through a news medium.

Having adequately established that Stephanopoulos was acting as a journalist at the time he acquired this information from the sources at issue, the court may address whether the invocation of the privilege was appropriate. The application of the factors contained in *Zerilli* and *Carey* to the instant case reveal that the identity of the sources relied upon by Stephanopoulos are covered by the journalist privilege. The identities of these individuals do not go to the heart of plaintiffs' claim. Stephanopoulos referred to a present strategy that is being contemplated by individuals outside the White House. In contrast, plaintiffs' lawsuit focuses on the alleged misuse of FBI files by individuals within the White House. Even plaintiffs' efforts to premise the relevance of the identities of these individuals on the theory that the White House is presently misusing government files falls short. Nothing in the deposition of Stephanopoulos suggests that his remarks were directed at individuals in the White House employing an "Ellen Rometsch strategy." Indeed, during his deposition Stephanopoulos testified that he was not referring to the use of FBI files when he made this statement. Stephanopoulos Dep. at 284.

The identity of the journalist's source must be more than relevant to the litigation of plaintiffs' claim. Moreover, it is not sufficient that the identity of the source would merely be helpful to plaintiffs or even highly material. The identity of the sources must be central to the litigation. For this reason, it is the conclusion of the court that notwithstanding any difficulty that plaintiffs may encounter in attempting to obtain this information elsewhere, the information sought by plaintiffs does not go to the very heart of plaintiffs' claims in this suit.

#### 4. *The Work Product Doctrine*

Finally, plaintiffs contest the invocation of the work-product doctrine by Lenzner in response to certain questions posed to him. Plaintiffs claim that "[a]t deposition, Lenzner selectively invoked the 'work product' doctrine to avoid having to answer specific questions about investigations of lawyers, judges, judicial officers (such as arbitrators), and adversaries of the Clinton White House." Pls.' Mot. to Compel at 27. Plaintiffs also contend that by selectively invoking the work-product doctrine instead of asserting it consistently, Lenzner waived his ability to assert the doctrine at all. *Id.* Moreover, plaintiffs assert that the protection afforded by the work product doctrine can be overcome in this case by an alleged showing of substantial need. *Id.* at 28.

Plaintiffs in large part fail to identify the specific questions that were not answered on the basis of the invocation of the work-product doctrine. Broad references to pages 67–85 and 231–44 within Lenzner's deposition are simply insufficient to define the issues that the court must consider. While review of the deposition testimony demonstrates that Lenzner refused to answer several questions on the basis of an asserted privilege, the court is left to speculate as to which questions plaintiffs seek to compel an answer.

In the motion to compel, plaintiffs do present one question to which Lenzner invoked a "privileged objection." Pls.' Mot. to Compel at 27. This "privileged objection" refers to a point at the beginning of Lenzner's deposition where his attorney made a broad instruction to Lenzner not to answer any questions that may implicate the disclosure of privileged information including attorney-client communications, attorney work product, disclosure of trade secrets, or other confidential research, development, or commercial information. Lenzner Dep. at 68. Because that basis and ground or grounds of the objection is uncertain, the court is unable to determine whether an answer to this question should be compelled. For this reason, plaintiffs may submit a set of narrowly tailored interrogatories to Lenzner regarding the issue of whether he has been ap-proached or retained to investigate Linda Tripp and questions regarding whether the invocation of any evidentiary privileges is appropriate. Lenzner should fully support any claims of privilege in response to these interrogatories in a manner that permits the court to ascertain whether the privileged claimed applies if necessary. *See, supra,* at 49. To the extent that plaintiffs seek to compel answers to questions beyond the one explicitly stated in the motion to compel, plaintiffs' motion is denied.

### C. *Plaintiffs' Request for Sanctions*

 Plaintiffs assert that the professional conduct of defendants, their witnesses, and their counsel has been improper and warrants stiff sanctions. Plaintiffs contend that "[t]hroughout the discovery process, and in motions practice, Defendants, their witnesses and counsel have flouted the rules of this Court and engaged in an effort to delay, harass and obstruct justice." Pls.' Mot. to Compel at 29. Plaintiffs cite an extensive list of actions forming the basis of their request for sanctions including: speaking objections by defense counsel and counsel for deposition witnesses, improper consultation with witnesses, "triple-team" objections, the insulting of plaintiffs' counsel, deception of the court, the invading of work product and attorney-client communications, and the filing of frivolous and spurious motions to run up the costs of litigation and delay the proceedings before this court.

In response to plaintiffs' request for sanctions, Carville filed a Motion for Leave to File Supplement to Opposition to Plaintiffs' Motion to Compel and Hillary Rodham Clinton filed a Motion for Leave to File a Surreply to Plaintiffs' Request for Sanctions Against Defendant Hillary Rodham Clinton. Carville filed his motion in order to place before the court the declaration of Rodolfo Gil which Carville states is relevant to the issues of his travel plans March 16–18, 1998 and therefore, relevant to the issue of whether he should be sanctioned as plaintiffs' request. Carville states that he was only able to reach Gil, a citizen of Argentina, on April 14, 1998—after the date for filing his opposition to plaintiffs' request for sanctions. The

**52**

court concludes that Carville has demonstrated good cause and therefore, his motion is granted and his supplemental opposition will be considered by the court.

Hillary Rodham Clinton filed her motion for leave to file a surreply due to the fact that plaintiffs included the declaration of Thomas J. Fitton in their omnibus reply. Because plaintiffs have presented new evidence before the court in the form of Fitton's declaration, good cause exists to permit Mrs. Clinton to file a surreply addressing the contents of this filing. Accordingly, Mrs. Clinton's motion for leave to file a surreply is granted and her surreply will be considered by the court.

In an order dated April 13, 1998, this court denied the EOP's motion for sanctions arising from the very same depositions presently at issue. The court noted that during these depositions, counsel for both plaintiffs and defendants and counsel for the witnesses as well as the witnesses themselves engaged in a pattern of uncivil and discourteous conduct. While the court will not impose sanctions in response to plaintiffs' motion, the court reiterates its admonishment to all parties to conform their conduct to more appropriate standards. Counsel for many parties involved have demonstrated that there is merit to the unfavorable image that society has bestowed upon the legal profession. Indeed, as one court has observed, "the high esteem in which our noble profession, the law, had been held over many centuries by laypersons has been eroded by the activities of our own miscreant practitioners." *People v. Rodriguez*, 101 Misc.2d 536, 424 N.Y.S.2d 600, 604 (N.Y.Sup.Ct.1979). The deposition transcripts contain examples of conduct and conversations too numerous to recount that one would be more apt to find in a school yard among adolescents than during a legal proceeding.

The title of attorney-at-law imposes a higher duty of professionalism, and the bearer of such noble title must conduct himself or herself in a dignified manner so as to preserve the integrity of the profession. Indeed, the words of the Massachusetts Superior Court aptly describe the conduct encountered by this court in the instant case:

The conduct this disgraceful record contains is the antithesis of the professional manner with which discovery—indeed, all that we do—must proceed. To engage in the practice of law is to engage in a noble profession. It is to approach the resolution of disputes with a spirit of high mindedness and with knowledge that the client's problems and antagonisms are not the lawyer's. By providing professional assistance to those who cannot resolve disputes without outside intervention and by championing their causes and interests in a professional manner, lawyers daily perform services of great social utility. But this kind of performance has no place in our judicial system. Behavior of the type this record reveals demeans the participants, demeans the witnesses and demeans the very system and essence of justice itself. It simply cannot be tolerated. A deposition is an extension of a judicial proceeding. It should be attended and conducted with the same sense of solemnity and the same rules of etiquette that would be required were the parties in the courtroom itself. The lawyer conducting the examination must ask questions and obtain answers—not demean, insult or hurl epithets at the opposing witness or counsel. The lawyer representing a witness must make objections, when objections are required, succinctly and with the same brief precision required during the trial itself.... Hundreds of depositions take place each week without incident and in conformity with those standards.

*Cholfin v. Gordon*, 1995 WL 809916 (Mass.Super. Mar. 22, 1995).

The court must make special notice of one particular problem encountered by plaintiffs during the course of the depositions—the "speaking objection." As the court stated in *Cholfin*, counsel representing a witness must make objections when called for "succinctly and with the same brief precision required during the trial itself." *Id.* It is highly inappropriate for counsel for the witness to provide the witness with responses to deposition questions by means of an objection, rephrase or alter the question, or engage in an argument with opposing counsel.

The parties are hereby on notice that conduct that can be characterized as a speaking objection during future depositions will be considered sanctionable should any party file the appropriate motion requesting sanctions.

Furthermore, in accordance with the views so well stated by the court in *Cholfin,* the parties shall conform their conduct to an acceptable level of civility. Further conduct of this sort will simply not be tolerated. Counsel for all parties and witnesses would be well served to refer to the preamble of the Model Code of Professional Responsibility:

> But in the last analysis it is the desire for the respect and confidence of the members of the profession and of the society which he serves that should provide to a lawyer the incentive for the highest possible degree of ethical conduct. The possible loss of that respect and confidence is the ultimate sanction. So long as its practitioners are guided by these principals, the law will continue to be a noble profession. This is its greatness and its strength, which permit no compromise.

Model Code of Professional Responsibility Preamble (1980). The legal profession as a whole will certainly survive the actions of counsel in the instant case no matter how grievous they may be. However, the court cannot help but conclude that the profession will indeed emerge from this lawsuit somewhat tarnished if this conduct continues.

▉ In a related matter, defendant Hillary Clinton's Opposition to Plaintiffs' Motion for Sanctions' requests that pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, this court strike plaintiffs' charges that attorney Paul Gaffney "threatened Plaintiffs' counsel and family." Rule 12(f) permits a court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Upon consideration of the submissions of plaintiffs on this issue, the court finds no evidence to support the claim made by plaintiffs with respect to Gaffney. Accordingly, this accusation shall be stricken from the record in this case and plaintiffs shall make no further references to these charges in any future filing with this court.

### D. *The Exclusion of Sally Paxton and David Cohen from Future Depositions*

▉ Finally, plaintiffs request that this court prohibit Sally Paxton, Special Associate Counsel to the President, and David Cohen, attorney for Craig Livingstone, from appearing at any further depositions in this case. Plaintiffs make this request pursuant to Rule 615 of the Federal Rules of Evidence.

Rule 615 states in relevant part that "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses ..." Fed. R.Evid. 615. Plaintiffs contend that Paxton and Cohen are material witnesses in this case and therefore, these individuals should be excluded from future depositions.

▉ Plaintiffs' reliance on Rule 615 is misplaced. Rule 30(c) of the Federal Rules of Civil Procedure governs the conduct of depositions and states that "[e]xamination and cross-examination of witnesses may proceed as permitted at the trial under the provisions of the Federal Rules of Evidence except Rules 103 and 615." Fed.R.Civ.P. 30(c). The Advisory Committee notes to Rule 30(c) add that "[t]he revision provides that other witnesses are not automatically excluded from a deposition simply by the request of a party. Exclusion, however, can be ordered under Rule 26(c)(5) when appropriate." *Id.* (Advisory Committee Notes for Rule 30(c), 1993 Amendments). Rule 26(c)(5) permits the court to enter a protective order ordering "that discovery be conducted with no one present except persons designated by the court." Fed.R.Civ.P. 26(c)(5).

▉ Even if this court were to consider plaintiffs' request a motion for protective order under Rule 26(c)(5), the EOP correctly points out that "there is no evidence that Rule 26(c)(5) was intended to bar parties from attending depositions." *Kerschbaumer v. Bell,* 112 F.R.D. 426, 427 (D.D.C.1986). Moreover, plaintiffs have failed to identify any compelling or extraordinary circumstances warranting the exclusion of these witnesses from future depositions. Accordingly, plaintiffs' request is denied.

**54**

### III. *Conclusion*

For the reasons stated in this opinion, plaintiffs' Motion to Compel, Order to Show Cause and for Sanctions Including Attorneys' Fees and Costs is granted in part and denied in part. The Motion of Williams & Connolly and Skadden, Arps & Connolly and Skadden, Arps, Slate, Meagher & Flom, LLP, On Behalf of President Clinton, To Intervene and For Protective Order is denied. James Carville's Motion for Leave to File Supplement to Opposition to Plaintiffs' Motion to Compel is granted. Hillary Rodham Clinton's Motion for Leave to File a Surreply to Plaintiffs' Request for Sanctions Against Defendant Hillary Rodham Clinton is granted.

A separate order shall issue this date.